STATE OF LOUISIANA

VERSUS

EDDIE HARRISON, III

CRIMINAL DISTRICT COURT

PARISH OF ORLEANS

CASE NO. 465-700 "G"

## STATE'S RESPONSE TO
## POST CONVICTION RELIEF APPLICATION

NOW INTO COURT, through the undersigned Assistant District Attorney, comes the State of Louisiana, who respectfully files the following response to Petitioner Eddie Harrison's "Application for Post-Conviction Relief" and supplemental memorandum in support thereof.

### STATEMENT OF THE CASE

On June 20, 2006, Petitioner was indicted for the May 22, 2006, attempted first-degree murder of New Orleans police officer Andres Gonzales. Petitioner was represented by Donald Donnelly at trial, which began on March 10, 2008, and ended on March 13, 2008, with a unanimous guilty verdict. On March 19, 2008, the court sentenced Petitioner as a multiple offender to one-hundred (100) years hard labor at the Department of Corrections.

Petitioner's conviction and sentence were affirmed on appeal by the Louisiana Fourth Circuit Court of Appeal on June 25, 2009, and the conviction and sentence became final on March 26, 2010, when the Louisiana Supreme Court denied writ.

On June 23, 2011, the Petitioner filed his application for post-conviction relief. Petitioner's original counsel, Cate Bartholomew, withdrew from the case and on September 13, 2016, attorney Mummi Ibrahim enrolled on behalf of Petitioner. The record does not reflect that Ms. Ibrahim withdrew from the case, however the record reflects that nothing was done to move the case forward until new counsel appeared on June 23, 2021. On that date Justin Harrell filed a supplemental memorandum on Petitioner's behalf.

In his application for and supplemental memorandum in support of post-conviction relief, Petitioner claims[1] (I) ineffective assistance of counsel when eliciting hearsay testimony from a State witness, (II) ineffective assistance of counsel for failing to investigate or subpoena Eddie Guillory, (III) ineffective assistance of counsel at

---

[1] The order of the claims follows the order of claims in the counseled supplemental memorandum.

sentencing, (IV) ineffective assistance of counsel for failing to effectively cross-examine witnesses regarding contradictions in the State's timeline, (V) ineffective assistance of counsel for accepting Madelyn Collins as an "expert" in blood analysis, (VI) violation of the Petitioner's right to testify, (VII) violation of Petitioner's right to collateral attack.

## STATEMENT OF THE FACTS

On May 22, 2006, Petitioner shot New Orleans Police Officer Andres Gonzales in the face and neck. As a result, Officer Gonzales was paralyzed. The following facts are from *State v. Harrison*, 2008-1110 (La. App. 4 Cir. 6/25/09), 16 So. 3d 447, 450–54:

> At trial, former NOPD officer Rebecca Gubert testified that on May 22, 2006, she and her partner/victim, NOPD Officer Andres Gonzales, were on patrol in a marked police unit when they stopped a car for suspicion of violation of the window tint law. After determining that the vehicle was in fact in violation of the law, Officer Gonzales asked the driver for proof of insurance, registration and driver's license, none of which the driver could produce. At the same time, Officer Gubert approached the passenger side of the stopped vehicle and encountered the defendant in the front passenger seat. Officer Gonzales ordered the driver to exit the vehicle. As the driver got out of the car, the defendant opened his door and ran. Officer Gubert alerted Officer Gonzales, who pursued the defendant on foot. Officer Gubert secured the driver in the back of the patrol unit, called in a report of the incident and a description of the defendant and followed the chase in the patrol unit. Officer Gubert witnessed Officer Gonzales turn on Verrett Street toward Opelousas Street as he chased the defendant. The next time she saw Officer Gonzales, he was lying on the sidewalk with a neck wound, unable to move. Officer Gubert rendered aid to Officer Gonzales and alerted police dispatch that the victim was wounded. She described the defendant as a muscularly built black male wearing twists in his hair, dark pants and a black t-shirt. Officer Gubert identified the defendant as the fleeing subject in a show up less than two hours after the shooting, and she also made an in-court identification of the defendant. She testified that by the time the defendant had been apprehended he was wearing a white t-shirt.
> NOPD Sgt. Arthur Kaufman testified that on May 22, 2006 at approximately 3:15 p.m., he received a report of a shooting in the 500 block of Opelousas Street. Dispatch described the defendant as a black male, approximately 5'11", six feet tall, twists in his hair, wearing a black shirt and dark jeans. Sgt. Kaufman stated that he was in charge of the investigation of the shooting and was assisted by several NOPD personnel collecting evidence. When Sgt. Kaufman arrived on the scene, Officer Gonzales was already en route to the hospital; however Sgt. Kaufman observed a large pool of blood, Officer Gonzales' gun belt and equipment and several .40 caliber shell casings[2] on the ground as well as bullet fragments inside an adjoining Laundromat. At approximately 5:00 p.m., support units brought the defendant back to the scene which is where Officer Gubert and two other witnesses, Ruth Farmer and Erin Farmer, identified the defendant. Additionally, Eddie Guillory also identified the defendant as the man who struggled with Officer Gonzales prior to the shooting. Although the NOPD mounted a massive search for the weapon, it was never recovered. Because of Officer Gonzales' critical injuries, Sgt. Kaufman was not able to interview him until June 2006, at which time Sgt. Kaufman presented Officer Gonzales with a photographic lineup from which he identified the defendant as the person who shot him. As the investigation progressed, Sgt. Kaufman learned of the existence of a surveillance video taken by the Westside Cleaners; however, Sgt. Kaufman did not view the video and later learned that it had been misplaced.

Madelyn Collins, former NOPD officer and criminalist, testified that she photographed the crime scene and collected four spent .40 caliber bullet casings, a cell phone, one white and one black t-shirt, money, a police radio, a Glock .40 caliber semi-automatic handgun (Sgt. Gonzales' gun) and a police baton.

ATF Agent Michael H. Hutton assisted the NOPD in its investigation of this case. Agent Hutton supplied one of the agency's explosives K–9s to search for the gun used to shoot the victim. However, the weapon was never found. Agent Hutton also shipped the gunshot residue kit assembled in this case to the Bexar County Texas crime lab for analysis. The test results indicated the presence of gun powder on the defendant's hands.

Michael Martinez, a forensic scientist supervisor in the trace evidence and firearms section of the Bexar County crime lab, testified that he received and tested the gunshot residue kit sent to him by ATF Agent Hutton. Mr. Martinez's analysis of the kit revealed the presence of gunshot residue on the defendant's right and left hand palms.

Mr. Edward Delery, a crime scene technician and former member of the NOPD crime lab, testified that he sketched the crime scene including the 600 blocks of Opelousas and Slidell streets all the way to the levee. The sketches identify the locations of bullet casings, pellet fragments, money and Sgt. Gonzales' police equipment found on the scene.

Sgt. George Waguespack testified that he assisted in the investigation of the shooting by collecting Officer Gonzales' clothing and his police equipment from the hospital. Upon examining Officer Gonzales' bullet proof vest, Sgt. Waguespack discovered a loose spent bullet located in the front panel of the vest. He was present when Officer Gonzales viewed the photo lineup and identified the picture of the defendant as the man who shot him.

Former NOPD Detective Gus Bethea testified he assisted in the investigation of the crime by contacting the owners of Westside Cleaners, a dry cleaning business located at Opelousas Street adjacent to the crime scene, on the day of the shooting. Bethea learned that the owners had a video surveillance camera pointed in the direction of the scene of the shooting. Bethea and Officer Ronald Ruiz along with the owners of Westside Cleaners viewed the black and white videotape which caught the image of two people running past the front window of the business. Because of the poor quality of the tape and because the images on the tape were so fleeting, no identification of the subjects could be made. Bethea had the tape duplicated and placed the original and the copy into the inter-departmental mailbox for delivery to Sgt Kaufman. However, Sgt. Kaufman never received the tape.[3] Along with the video tape, Bethea logged into evidence one Louisiana State Driver's license in the name of Eddie Harrison, one green cigarette lighter, one stocking cap and a black leather wallet retrieved from the scene of the shooting.

Remy Dixon, one of the owners of Westside Cleaners, testified that about 3:00 p.m. on May 22, 2006, he was working at his business and heard gunshots, but did not witness the shooting. Mr. Dixon explained that his business had an inside surveillance camera which is pointed at the front door of the building on Opelousas Street. He viewed the surveillance film which showed two people running past the front of his building just before the gunshots were heard. No identification was possible because the view was so fleeting the figures were blurred. Mr. Dixon said that Officer Gonzales was lying on the ground about fifteen feet from the front door of his business.

Stacey Farmer testified that she lived in the 200 block of Slidell Avenue on May 22, 2006 and heard gunshots in the area. At the same time she heard police sirens in the neighborhood, she looked out her window and saw a man wearing a black shirt with a white t-shirt on his shoulder searching the high grass on Brooklyn Street near her house. She watched the subject until he walked over the river levee and out of sight. Ms. Farmer described the subject as a black male with dreadlocks (in his hair) wearing dark pants with orange writing and two t-shirts—one black and one white. She identified

3

the defendant in court as the person she saw looking in the high grass about five minutes after she heard gunshots.

Ruth Farmer and Erin Farmer, Stacey Farmer's mother and sister respectively, testified. They corroborated Stacey Farmer's testimony. In a show up shortly after the shooting both Mrs. Ruth Farmer and Erin Farmer identified the defendant as the man they saw looking in the grass near their home. They also made an in court identification of the defendant.

NOPD Sgt. Ronald Ruiz testified that the day after the shooting he helped search for the gun used in the shooting. He and other investigators searched the entire day but no weapon was ever located. Sgt. Ruiz viewed the surveillance tape from the dry cleaning business with Detective Gus Bethea, but was unable to discern any physical characteristics of the two fleeting subjects shown on the tape.

NOPD Officer Carl Thibodeaux testified that he was on the west bank of the river when he heard the report of a shooting in the Algiers area. Officer Thibodeaux proceeded to the intersection of Burmaster and Monroe Streets where he encountered a man on a train pointing down toward the river. Officer Thibodeaux exited his car and walked to the top of the levee. He saw the defendant walking toward him. When the defendant saw Officer Thibodeaux, the defendant turned around and proceeded into a grassy area between the river embankment and some barges. At that point, other police units arrived at the scene and pursued the defendant. Officer Thibodeaux made an in court identification of the defendant as the man he saw on the levee.

Detective Eduardo Colmenero assisted in investigating the shooting. The detective collected the defendant's clothing after his arrest and presented the clothing to Central Evidence and Property. He described the clothing as a white tank top, jeans, black socks, multi colored underwear and Nike shoes. Upon examining the clothing, Detective Colmenero observed grass on the pants and possible blood stains on the shoes.

Detective Harold Wischan participated in the investigation by being dispatched to the 700 block of Brooklyn Street in Algiers to recover a white and a black t-shirt.

Sgt. Tyrone Robinson retrieved Officer Gonzales' duty rig and weapon from the scene in the 600 block of Opelousas Street. Sgt. Robinson gave the evidence to one of the homicide detectives on the scene.

Sgt. Luther Randall assisted in apprehending the defendant. Sgt. Randall heard the report of the shooting from dispatch indicating that the perpetrator was headed toward the levee. When Sgt. Randall arrived at Brooklyn Street, he saw a suspect fitting the description of the shooter walking behind some trains headed to Gretna. When the defendant saw Sgt. Randall and other police units approaching, he surrendered to the officers.

Meredith Acosta, a NOPD firearms expert, examined the .40 caliber handgun, bullets and bullet casings gathered at the crime scene. Ms. Acosta's testing of the evidence indicated that four of the .40 caliber cartridge cases were fired by the same weapon but not the .40 caliber handgun found at the scene. Comparing one bullet found at the scene with a bullet retrieved at the Elmwood Medical Center proved both bullets were fired by the same weapon, but again, not from the weapon found at the scene.

Jennifer Marie Schroeder worked in the NOPD's DNA laboratory. After explaining the science and importance of DNA testing for identification purposes, Ms. Schroeder testified that she ran testing on a cheek swab taken from the defendant as well suspected blood spots found on the shoes worn by the defendant at the time of the shooting. The test results came back inconclusive meaning that the samples either were not blood or that the samples had been degraded by the elements and/or fungus or bacteria, rendering the samples useless for forensic purposes.

NOPD Officer Andres Gonzales, the victim, testified that on May 22, 2006, he and his partner, Officer Rebecca Gubert, were on patrol in the Algiers Point area. They affected a vehicular stop of a vehicle suspected of being in violation of the window tint law. Officer Gonzales exited his patrol unit and

engaged the driver of the other car. Officer Gonzales explained to the driver the reason for the stop. Officer Gonzales used a meter to test the window tint and found that the tint was in violation of the law. Officer Gonzales asked the driver for identification, registration and proof of insurance, none of which the driver could produce. Officer Gonzales instructed the driver to get out of the vehicle. As the driver complied, the defendant exited the car and fled. Officer Gonzales chased the defendant down Verrett Street toward Opelousas Street and then toward the river. Officer Gonzales caught up with the defendant on Opelousas Street. The pair began to struggle. The defendant pulled a gun from his clothing and shot Officer Gonzales in the neck, which paralyzed him immediately, and then shot the victim one more time as he lay on the ground. Following several weeks of medical procedures and rehabilitation, Officer Gonzales identified the defendant from a six picture lineup presented to him by Sgt. Kaufman and Det. Waguespack. Officer Gonzales also made an in court identification of the defendant as the man who shot him.

Dr. Alan Marr, an expert in critical care and trauma surgery, testified that he attended to Officer Gonzales at Elmwood Trauma Center on the day of the shooting. The doctor noted Officer Gonzales suffered gunshot wounds to the face, neck and arm and was in shock suffering dangerous loss of blood on arrival at the hospital. The gunshot to Officer Gonzales' neck fractured the hyaloid bone, which helps support the swallowing tube and trachea, tore the top of the trachea and pharynx, proceeded through the fourth and fifth cervical vertebrae and then severed his spinal cord which resulted in instant, non-reversible paralysis. Dr. Marr explained that Officer Gonzales may have very limited use of his hands with rehabilitation, but he will never walk again. The wound to the face caused massive facial fractures. Officer Gonzales underwent eight hours of surgery to repair and stabilize his condition. Neurosurgeons, oral maxillofacial, and ear, nose and throat surgeons assisted in the surgery. During the weeks following the incident, Officer Gonzales underwent two follow up surgical procedures, was placed on a ventilator for two weeks and required antibiotics, pain medication and heavy sedation. Dr. Marr opined that Officer Gonzales will in all likelihood suffer psychological injuries such as post traumatic stress disorder (PTSD). The symptoms of PTSD can include difficulty concentrating and holding a job, exaggerated fear responses, memory loss and probable likelihood of alcohol abuse. At the time Officer Gonzales victim was discharged from Dr. Marr's care, he was prescribed twelve different medications for treatment of his injuries.

At the victim impact hearing, Officer Gonzales and his parents made statements concerning the life altering impact of his injury. Officer Gonzales stated that his life's ambition was to be a policeman, an ambition the defendant has taken away from him. He stated that he is unable to perform the everyday tasks people take for granted. He requires care twenty-four hours a day, seven days a week. His injuries have stripped him of his dignity, livelihood, dreams, ambitions and hopes for a normal life. The defendant's action has condemned Officer Gonzales to life in a wheelchair.

## LAW & ARGUMENT

In order for a court to rule on the merits of a post-conviction relief application ("PCR" or "Application"), it first must find that there are no procedural bars. Petitioner's conviction and sentence became final on March 26, 2010, when the Louisiana Supreme Court denied writ. Petitioner's PCR was timely filed on June 23, 2011.

However, a petitioner must establish that an evidentiary hearing is necessary to prove a valid claim. In other words, the petitioner must prove that there are factual or legal

issues that cannot be resolved based on documents already in the record or attached to the PCR pleadings of the parties.[2] See La. C.Cr.P. Arts 928, 929. La. C.Cr.P. art. 929(A) states, in relevant part, that if the Court determines that the factual and legal issues can be decided based on the record presented, no hearing is necessary. The Court in this case should deny relief based on the record and without the need for an evidentiary hearing.

**I.      Petitioner's trial counsel was not ineffective when a State's witness's answer was not responsive to trial counsel's question which was not phrased to elicit hearsay. (Original claim #1, supplemental #1)**

Petitioner's first claim should be denied because it does not meet the *Strickland* test. The United States Supreme Court established a two-pronged test to determine ineffective assistance of counsel in *Strickland v. Washington*.

First, there must be a specific showing that counsel's performance fell below an objective standard of reasonableness. The Petitioner failed to show how trial counsel's performance was unreasonable when examining the witness. In this case trial counsel asked Sergeant Kaufman whether Eddie Guillory participated in a show up lineup. Sergeant Kaufman offered more information than what was asked, explaining that Guillory did not participate in a lineup but pointed Petitioner out to police officers to aid in Petitioner's apprehension. In other words, trial counsel did not elicit hearsay.

Second, counsel's performance must have given rise to a reasonable probability that if counsel had performed adequately, the result would have been different. As to the second prong, Petitioner's counsel's actions did not prejudice the defendant such that it affected the outcome of the proceeding. Here, the issue is that a police officer, Sergeant Kaufman, testified that a third party, Eddie Guillory, identified the Petitioner and recognized him as the person who struggled with Officer Gonzales. Even if the hearsay testimony of the officer at trial was excluded, the result of the proceedings would not have been different. There were multiple other persons who testified that they saw the Petitioner near the crime or during the shooting: Three eyewitnesses saw Petitioner nearby the shooting about five minutes after hearing gunshots; NOPD Officer Carl Thibodeaux saw Petitioner near the scene; Sergeant Randall apprehended Petitioner near the scene. All five of these witnesses made an in-court identification of the Petitioner at trial. Most importantly, the victim

---

[2] The State submits the entire record on appeal in 2008-KA-1110 as part of its Response. The 3-Volume record has been sent electronically to opposing counsel and the Court on November 12, 2021.

himself identified Petitioner as the man who shot him. Even if the testimony of Sergeant Kaufman was excluded, there are so many other positive identifications of the Petitioner that there is no reasonable probability that the outcome of the trial would have been different. Petitioner's first claim should be denied without a hearing because he cannot meet the *Strickland* standard.

## II. Petitioner was not denied effective assistance of counsel when his attorney failed to investigate or subpoena Eddie Guillory. (Original claim #3, supplemental #2)

Petitioner's second claim is that trial counsel was ineffective for failing to investigate Eddie Guillory or subpoena him as a witness. Petitioner's second claim should be denied because he was not denied his right to a fair trial merely because trial counsel did not interview one witness. Not only is the proposed testimony of the new witness not exculpatory, it is by Petitioner's own admission inculpatory. On page 11 of Petitioner's pro-se Application Petitioner quoted Eddie Guillory's statement to the police: "he then saw a black male and a police officer struggling, after that he heard three gunshots and the man that did the shooting kept running." Petitioner has failed to allege what Mr. Guillory would have said on the witness stand that is favorable to Petitioner. As such, Petitioner can show no prejudice from his counsel's failure to subpoena Eddie Guillory, who would have testified favorably for the State. This claim should be denied without a hearing.

## III. Petitioner was not denied effective assistance of counsel at sentencing. (Original claim #4, supplemental #3)

Petitioner claims that he was denied effective assistance of counsel at sentencing because his attorney failed to object when the judge mentioned that he (the judge) suspected Petitioner was involved in other crimes based on items discovered in the car Petitioner was riding in. This claim can be denied without a hearing because the record reflects that the sentence was not "based upon facts not introduced in the record" as Petitioner claims.

Prior to sentencing the trial court noted that this was Petitioner's second conviction for a crime of violence and that Petitioner had a history of violent behavior. Petitioner pled guilty to two counts of armed robbery in 1999 and was sentenced to 5 years. Only 2 years after his sentence was completed, he shot Officer Gonzales. Between his release from prison for the armed robbery and the attempted murder of Officer Gonzales Petitioner was arrested for multiple crimes involving guns and violence.

The judge sentenced Petitioner after listening to the heart-breaking testimony of Officer Gonzales and his parents. It is clear, when viewing the sentencing transcript in its entirety and not just two paragraphs, that the judge based the sentence on the heinous nature of Petitioner's actions and the permanent and catastrophic physical and emotion harm caused. The judge noted that Officer Gonzales deployed his expandable baton during the chase, choosing to use a non-lethal weapon to bring Petitioner into custody. "But", as the judge explained, "being the coward that you are, you turn and open fire on him with a gun."[3]

The judge also addressed any reviewing court:

> I want any reviewing court that looks at this record to know the following: Officer Gonzalez is paralyzed. His upper and lower extremities are atrophy. He cannot move below the waist at all and he does have some movement in his arms. From lack of use over the years, his left and right hands have withered. He cannot open nor close his hands. He cannot use his fingers and the best he can do to get around is to use a joystick on his motorized wheelchair and he's going to be like this for the rest of his life because you decided to shoot him instead of taking your charge for the 95.1, the armed robbery, or whatever it was that you worried about at the time.[4]

The State has attached the entire transcript of the sentencing as Exhibit 1 for the Court's convenience. It is also included in Volume 3 of the record on appeal also submitted to the Court.

**IV.   Petitioner's trial counsel was not ineffective for failing to cross-examine witnesses regarding alleged contradictions in the State's timeline. (Original claim #5, supplemental #4)**

Petitioner's fourth claim is that trial counsel was ineffective because he failed to cross-examine State witness Sergeant Luther Randall regarding his testimony that he did not remember what time of day the Petitioner was arrested. According to Petitioner, the State argued that Petitioner was in custody at 3:30. Sergeant Luther Randall testified that he could not remember what time Petitioner was taken into custody. However, a report written by Tony Small states that Petitioner was apprehended after 3:00 pm.

Petitioner's claim should be denied without a hearing, because there is no inconsistency and his attorney could not have cross examined Sergeant Luther Randall with a report written by Tony Small. As such, not only was there no deficient performance, but there was no prejudice.

---

[3] Sentencing Transcript, p. 34.
[4] Sentencing Transcript, p. 37.

**V.** **The trial court did not err in accepting Madelyn Collins as an "expert" in blood analysis and this claim is procedurally barred. (Original claim #6, supplemental #5)**

Petitioner's fifth claim is that the trial court erred in accepting Madelyn Collins as an expert in the field of serology. The defense objected to the expertise and as such the issue was preserved for appeal. The issue was never raised on appeal, and pursuant to La. C.Cr.P. Art 930.4(C) cannot be raised in post conviction relief. It should be denied.

Furthermore, Petitioner fails to allege any prejudice from Ms. Collins's expert testimony that Petitioner's shoes did *not* contain blood splatter.

**VI.** **Petitioner was not denied his constitutional right to testify on his own behalf. (Original claim #2, supplemental #6)**

Petitioner's sixth claim is that there was a violation of Petitioner's right to testify on his own behalf. Specifically, Petitioner alleges that he was denied his Constitutional right to testify on his own behalf at the ill-advice of counsel, against Petitioner's wishes.

Petitioner does not claim in his original and pro-se application that he was prohibited from testifying. Instead, he admits that he "declined" to testify and that trial counsel "advised" him not to testify. There is no allegation that Petitioner was barred from testifying. Taking all the factual allegations within the original and pro-se application as true, Petitioner's right to testify was not infringed.

Surprisingly, Petitioner's counseled supplemental Application alleges completely different facts, stating that Petitioner's "repeated requests to testify . . . were met with Counsel's outright refusal to permit his client to testify." Furthermore, Petitioner's post conviction counsel purports to support this claim with an affidavit that is not attached to the Application.

Even with an affidavit of Petitioner, if there is no affidavit from trial counsel, Petitioner has not made a sufficient showing to warrant an evidentiary hearing. *See State v. Marshall*, 2014-2091 (La. 10/14/15), 177 So. 3d 324, 329 ("Absent an affidavit from trial counsel to substantiate respondent's allegation [that a pre-trial plea offer was not conveyed to him], the claim lacks sufficient credibility to warrant an evidentiary hearing to ascertain the truth of the claim"). Federal Courts have made similar findings. In *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991) the Seventh Circuit held that a "barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied

9

him." The court held that there needed to be something else to corroborate the petitioner's claim "such as an affidavit from the lawyer who allegedly forbade his client to testify . . . to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim." *See also Passos-Paternina v. United States*, 12 F. Supp. 2d 231, 239 (D.P.R. 1998), aff'd, 201 F.3d 428 (1st Cir. 1999); *Siciliano v. Vose*, 834 F.2d 29, 31 (1st Cir.1987).

Undersigned counsel has spoken to trial counsel who has agreed to provide an affidavit in connection with this claim. The affidavit has not been received as of the date of filing, but the State will supplement its response with the affidavit when it is received.

In the event this Court decides that Petitioner has met this burden, then Petitioner's claim may require an evidentiary hearing in order for Petitioner to prove his claim with the testimony of trial counsel.

**VII.   Petitioner was not denied his right to collateral review. (Original claim #7, supplemental #7)**

Petitioner's final claim is that trial counsel was ineffective for not requesting a transcript of the entire proceedings. Specifically, Petitioner alleges that his Sixth and Fourteenth Amendments rights to sufficiently challenge his conviction have been violated for numerous reasons, including that he has been denied access to transcripts; that there was indiscriminate use of peremptory challenges by the State during voir dire to remove African Americans from the jury; that the District Attorney made impermissible comments at trial about an alleged confession from the Petitioner; and that the trial judge made a comment that gave the jury the impression of Petitioner's guilt.

Petitioner appears to argue that had he received the transcripts of voir dire, opening statement, closing argument, and jury instruction he would have been successful on appeal. However, Petitioner fails to brief how he would have been successful. Furthermore, the transcripts reflect that there were no objections lodged during the portions of the trial to which Petitioner points. These portions of proceedings are not usually transcribed unless there is an objection. As there was no such objection, the issue cannot be raised upon appeal. Petitioner's seventh claim should therefore be denied without a hearing.

## CONCLUSION

For the reasons stated above, the Petitioner has failed to demonstrate that he is entitled to any post-conviction relief in this case. Additionally, under La. C.Cr.P art. 929,

all claims raised by the petitioner in his application for post-conviction relief can be properly resolved through a review of the record presented. No evidentiary hearing should be ordered by the court in this case, and any and all relief requested by the petitioner should be denied by this Honorable Court.

Respectfully submitted,

Brad Scott, Bar No. 32680
Orleans Parish District Attorney's Office
619 South White Street
New Orleans, LA 70119
Telephone: (504) 827-6336
bscott@orleansda.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon opposing counsel for the petitioner (or petitioner if *pro se*) this 24 day of Nov , 2021 by sending it to:

Justin Caine Harrell
1100 Poydras Street, Suite 2900
New Orleans, LA 70163
Via email: justin.h2law@gmail.com

Brad Scott

11

STATE OF LOUISIANA        CRIMINAL DISTRICT COURT

VERSUS        PARISH OF ORLEANS

EDDIE HARRISON        NO. 465-700   SECTION G

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## JUDGMENT

This matter comes before the Court on an Application for Post-Conviction Relief (PCR) and a subsequent Supplemental Memorandum. Petitioner's first PCR application filed on June 23, 2011, asserts ineffective assistance of counsel at several stages of the trial court proceedings and violations of Petitioner's right to testify and his right to collateral attack. In Petitioner's Supplemental Memorandum filed in this Court on April 28, 2021, Petitioner reasserts his claim that his 5th, 6th, and 14th Amendment rights were violated when his trial counsel refused to allow him to testify in his own defense. Petitioner offers *State v. Hampton*, 818 So.2d 720 as support. ("[A] defendant's right to testify on his own behalf is a necessary corollary of his Sixth Amendment right to compulsory process" and "among those rights that "'*are essential to due process of law in a fair adversary process.*'") (citing *Rock v. Arkansas*, 483 U.S. 44). Additionally, Petitioner asserts the trial court sentenced him based on facts not introduced into the record, evidence that was irrelevant to Petitioner's charged offense, and unadjudicated offenses that the Court believed Petitioner was likely to commit.

## FACTS

On May 22, 2006, NOPD Officer Andres Gonzales and his partner, Officer Rebecca Gubert, were on patrol in Algiers when they pulled over a vehicle on suspicion of a window tint violation. When the driver could not provide proof of insurance, registration, or a driver's license, Officer Gonzales asked him to exit the vehicle. As the driver got out of the car, the passenger opened his door and ran. Officer Gonzales then pursued the passenger on foot while Officer Gubert secured the driver in her patrol unit, called in a report, and followed the chase in her patrol unit. When Officer Gubert next saw Officer Gonazales, he was lying on the sidewalk with a neck wound, unable to move. Officer Gubert rendered aid and alerted police dispatch. She described the perpetrator as a muscularly built black male with twists in his hair, dark pants, and a black t-shirt.

New Orleans Police Department Sergeant, Arthur Kaufman, arrived on scene after Officer Gonzales had already been escorted to the hospital. Sgt. Kaufman stated at trial that he was in charge of the investigation of the shooting and was assisted by several NOPD officers

collecting evidence. At 5:00 p.m., less than two hours after Sgt. Kaufman got the report of the shooting, support units brought the defendant to the scene. Officer Gubert identified him as the man who fled the vehicle; Ruth and Erin Farmer identified him as the man they saw walking on the levee near their property shortly after the shooting. Eddie Guillory also identified the defendant as the man who was struggling with Officer Gonzales prior to the shooting. Despite a massive search, the weapon used to injure Officer Gonzales was never recovered. Due to his extensive injuries, Sgt. Kaufman did not interview Officer Gonzales until June 2006, at which time Officer Gonzales, presented with a photographic lineup, identified the defendant as the person who shot him.

## PROCEDURAL HISTORY

On March 24, 2006, the State filed a bill of information against Eddie Harrison III charging him attempted first-degree murder (La. R.S. 14:(27)30) and possession of a firearm by a felon (La. R.S. 14:95.1). The Petitioner was found guilty by a jury on March 13, 2008, and the State filed a multiple bill against him on March 17, 2008. On March 19, 2008, the Court sentenced Petitioner to 100 years at hard labor without the benefit of probation, parole, or suspension of sentence. On June 25, 2009, the Fourth Circuit Court of Appeals affirmed Petitioner's conviction and sentence. On March 26, 2010, the Louisiana Supreme Court denied writs.

On June 23, 2011, Petitioner, through counsel Shawn Higgins, filed an Application for Post-Conviction Relief, requesting an evidentiary hearing. On March 21, 2013, Cate Bartholomew filed a motion to enroll as counsel of record and the Court set an evidentiary hearing for June 13, 2013. On March 25, 2014, the State filed a motion to disqualify defense counsel pursuant to Rule 1.11 of the Louisiana Rules of Professional Conduct. On May 14, 2015, defense counsel Cate Bartholomew filed a motion to withdraw as counsel of record; the Court granted her motion on May 15, 2015. On September 13, 2016, Mummi S. Abraham filed a motion to enroll as counsel of record.

On April 28, 2021, the Petitioner filed a second a subsequent uniform Application for Post-Conviction Relief and a motion to stay PCR proceedings. On June 23, 2021, counsel Justin Harrell appeared in court without Petitioner to file a supplemental memorandum in support of Petitioner's application for Post-Conviction Relief. On October 5, 2021, and November 2, 2021, Petitioner appeared with counsel for a status hearing. On November 29, 2021, the State filed its response to Petitioner's Post-Conviction Application.

The claims made by Petitioner in his original and supplemental applications are addressed individually below in the order they are raised in Petitioner's first application:

**1) Petitioner's trial counsel was ineffective when eliciting hearsay from a state witness. (Original claim #1, supplemental claim #1)**

At trial, defense counsel asked Sergeant Arthur Kaufman if "there were any other witnesses shown Mr. Harrison in a show up lineup." Sergeant Kaufman responded that "Eddie Guillory saw him and pointed him out as the person who was struggling with Officer Gonzales prior to Officer Gonzales being shot." [*See* Trial Transcript in State v. Eddie Harrison III, pp. 43:32-45]. Petitioner claims that his counsel was ineffective when he elicited hearsay from State's witness Sergeant Arthur Kaufman. To meet his burden, Petitioner must make a specific showing that his counsel's performance fell short of an objective standard of reasonableness and that, if counsel had performed adequately, there would have been a reasonable probability of a different outcome. See *Strickland v. Washington*, 466 U.S. 668 (1984).

This exchange indicates that counsel either intended to elicit hearsay or did so unintentionally as a result of not having the facts at hand. However, Petitioner has not shown that, had his counsel not pursued this line of questioning, the outcome of the proceeding would have been different. Five witness identified Petitioner at or near the scene and made subsequent identifications of Petitioner in court: Stacey Farmer, Ruth Farmer, Erin Farmer, Officer Carl Thibodeaux, and Officer Andres Gonzalez. (*See* T. Tr. 479:16-20, 489:8-14, 494:21-28, 514:23-31, 549:29-30). Thus, the defense has failed to prove that, but for Sergeant Kaufman's unsolicited testimony regarding Mr. Eddie Guillory, a different outcome was reasonably probable. For the foregoing reasons, Petitioner's claim is denied.

**2) Petitioner's constitutional right to testify on his own behalf was violated by trial counsel. (Original claim #2, supplemental claim #6)**

Petitioner claims his 5th, 6th, and 14th amendment rights were violated by his counsel's refusal to allow him to testify on his own behalf during trial. In *State v. Hampton*, the Louisiana Supreme Court held that a court should presume a defendant has waived his right to testify if he did not testify at trial. The defendant can rebut this presumption by alleging specific facts from which the court could reasonably find that trial counsel "told [the defendant] that he was legally forbidden to testify or in some similar way compelled him to remain silent." 818 So.2d at 729-30.

Here, counsel's supplemental application references an affidavit from Petitioner stating that he asked his counsel on multiple occasions to allow him to testify but was met with outright

refusals from counsel. However, this affidavit is not attached to the application and cannot be located. Moreover, in the original PCR application filed in June 2011, Petitioner admits he "declined" to testify, and that trial counsel "advised" him not to do so. In the absence of an affidavit from Petitioner alleging specific facts and contrary evidence in the original application, the Petitioner has not met his burden to show his 5th, 6th, and 14th amendment rights were violated. Furthermore, even if Petitioner had submitted an affidavit, it constitutes self-serving testimony that contradicts his previous assertions. For the foregoing reasons, Petitioner's claim is denied.

**3) Petitioner was denied effective assistance of counsel when his attorney failed to investigate or subpoena Eddie Guillory. (Original claim #3, supplemental claim #2)**

Petitioner claims his defense counsel was constitutionally ineffective when he failed to subpoena Eddie Guillory, who, according to Sergeant Kaufman's testimony, identified the Petitioner as the man who struggled with Officer Gonzales. Again, the record indicates that counsel's performance on this issue was less than exemplary, as Sergeant Kaufman's testimony appeared to be the first instance counsel learned of Eddie Guillory. However, Petitioner has failed to explain what evidence Eddie Guillory may have offered that would have given rise to a reasonable probability of a different outcome. As previously mentioned, there were five witness who saw Petitioner near the scene shortly after the shooting and made identifications in court, not including the identification made by Officer Andres Gonzalez. Thus, Petitioner has not met his burden of proving a reasonable probability of a different outcome, if his attorney had investigated or subpoenaed Eddie Guillory. For the foregoing reasons, Petitioner's claim is denied.

**4) Petitioner was denied effective assistance of counsel at sentencing. (Original claim #4, supplemental claim #3)**

Petitioner's claim of ineffective assistance of counsel during sentencing merits a more serious inquiry. Petitioner asserts that the "trial court made factual determinations regarding the existence of an uncharged and unadjudicated offense" as a basis to increase Petitioner's sentence. The transcript suggests that the trial court judge's reasoning for the sentence depended, at least in part, on his personal belief that the stocking cap found in Petitioner's vehicle indicated intent to commit armed robbery. (See T. Tr. 681:32-682:10). Here, Petitioner claims that his attorney's failure to object during the judge's commentary rendered him no more than "a warm body dressed in a suit." This suggested that, but for his complacency in the face of speculation from the bench, Petitioner's sentence would have been less severe. However, Petitioners assertions do not satisfy his *Strickland* burden.

The Fourth Circuit Court of Appeals' ruling on Petitioner's direct appeal effectively precludes his assertion of prejudice arising from his counsel's ineffectiveness during sentencing. Specifically, the Court rejected Petitioner's claim of an excessive sentence, pointing out that "[t]he reasons set forth in support of the maximum sentence available in this case include at least seven of the sentencing considerations of La. C.Cr.P. art. 894.1(B)." *State v. Harrison*, 16 So.3d 447 (La. Ct. App 6/25/2009). The Court held that, even if the sentencing judge referenced irrelevant considerations during sentencing, he nonetheless relied on sufficient *relevant* considerations to justify the sentence he handed down. Petitioner thus cannot prove that, but for his counsel's ineffectiveness during sentencing, there is a reasonable probability his sentence would have been different. Furthermore, pursuant to La. C.Cr.P. art. 930.4(A), "[u]nless required in the interests of justice, any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered." For the foregoing reasons, Petitioner's claim is denied.

**5) Petitioner's trial counsel was ineffective for failing to cross-examine witnesses regarding alleged contradictions in the State's timeline. (Original claim #5, supplemental claim #4)**

Petitioner claims his trial counsel was ineffective when he failed to cross-examine Sergeant Luther Randall, who asserted that he did not recall what time Petitioner was arrested. According to Petitioner, Sergeant Randall's response was intended to avoid the admission that NOPD continued searching for a suspect after Petitioner was arrested. However, the State asserted that Petitioner was in custody at 3:30 and the referenced police report states Petitioner was apprehended

at 3:00pm. Because there is no inconsistency in the State's presentation and Officer Small's report, Petitioner has not demonstrated how a more rigorous cross-examination of Sergeant Randall would have created a reasonable probability of a different outcome. Therefore, while Petitioner makes several claims regarding ineffective assistance of counsel, none of them support a reasonable probability that more adequate performance would have changed the result of the proceedings. *See Strickland v. Washington*, 466 U.S. 668 (1984). For the foregoing reasons, Petitioner's claim is denied.

**6) The trial court erred in accepting Madelyn Collins as an "expert" in blood analysis. (Original claim #6, supplemental claim #5)**

The record indicates that defense counsel objected to certification of Ms. Collins as an expert in serology. (Tr. T. p. 399, lines 5-6). However, as this issue was not raised on appeal, it cannot be raised in a claim for post-conviction relief pursuant to C.Cr.P. Art. 930.4(C). Moreover, as the State points out, Ms. Collins testified that Petitioner's shoes did not contain blood spatter. (Tr. T. p. 399, lines 14). Petitioner fails to allege how this testimony prejudiced him. For the foregoing reasons, Petitioner's claim is denied.

**7) Petitioner's right to collateral attack was denied. (Original claim #7, supplemental claim #7)**

Petitioner claims that his constitutional right to sufficiently challenge his conviction (collateral review) has been violated because he does not have transcripts of the following: *voir dire* examination, opening statements, closing statements, and jury instructions. More specifically, Petitioner claims that the prosecution used peremptory strikes to indiscriminately remove African American jurors from jury selection and used more peremptory strikes than is allowed by La. C.Cr.P. Article 799. Furthermore, Petitioner alleges the District Attorney made impermissible comments at trial about an alleged confession from Petitioner, and the trial judge made a comment that gave the jury the impression of Petitioner's appeal.

Here, Petitioner has not sufficiently articulated how access to these transcripts would have made him successful on appeal. Moreover, the trial transcript indicates that no objections were lodged during *voir dire* (*See* Trial Transcript in *State v. Eddie Harrison III*, pp. 324:1-2), opening statements (Tr. T. p. 331:9-10), closing statements (Tr. T. p. 641:10-12), or jury instructions (Tr. T. p. 641:10-12). Generally, these portions of trial are not transcribed unless objections are raised by counsel. Because no objections were raised, the issues cannot be raised on appeal, Petitioner's claim is denied.

For the foregoing reasons, the Petitioner's Application for Post-Conviction Relief is **DENIED**.

New Orleans, La., this ____ day of _____, 2022.

_____
HONORABLE, JUDGE NANDI F. CAMPBELL

09/20/2022 "See News Release 041 for any Concurrences and/or Dissents."

# The Supreme Court of the State of Louisiana

**STATE OF LOUISIANA**

No. 2022-KP-00923

**VS.**

**EDDIE HARRISON**

— — — — — —

IN RE: Eddie Harrison - Applicant Defendant; Applying For Supervisory Writ, Parish of Orleans Criminal, Criminal District Court Number(s) 465-700, Court of Appeal, Fourth Circuit, Number(s) 2022-K-0213;

— — — — — —

**September 20, 2022**

Writ application denied. See per curiam.

JTG
JLW
SJC
WJC
JBM
PDG

Supreme Court of Louisiana
September 20, 2022

Chief Deputy Clerk of Court
For the Court

| STATE OF LOUISIANA | CRIMINAL DISTRICT COURT |
|---|---|
| VERSUS | PARISH OF ORLEANS |
| EDDIE HARRISON | NO. 465-700   SECTION G |

*********************************************************************

## JUDGMENT

This matter comes before the court on three Subsequent Applications for Post-Conviction Relief ("PCR") and a Motion to Correct Illegal Sentence. In his PCRs, Petitioner Eddie Harrison asserts (1) that he is entitled to relief under *Ramos v. Louisiana*; (2) that he is factually innocent of both the crime for which he was convicted and of being a multiple offender; (3) that he received ineffective assistance of counsel during his multiple bill proceedings; and (4) that he is entitled to relief under *State v. Brady*. In his Motion to Correct Illegal Sentence, Mr. Harrison asserts his sentence is unconstitutional.

## FACTS

On May 22, 2006, NOPD Officer Andres Gonzales and Officer Rebecca Gubert were on patrol in Algiers when they pulled over a vehicle on suspicion of a window tint violation. When the driver could not provide proof of insurance, registration, or a driver's license, Officer Gonzales asked him to exit the vehicle. As the driver got out of the car, the passenger opened his door and ran. Officer Gonzales then pursued the passenger on foot while Officer Gubert secured the driver in her patrol unit, called in a report, and followed the chase in her patrol unit. When Officer Gubert next saw Officer Gonzales, he was lying on the sidewalk with a neck wound, unable to move. Officer Gubert rendered aid and alerted police dispatch. She described the perpetrator as a muscularly built black male with twists in his hair, dark pants, and a black t-shirt.

New Orleans Police Department Sergeant, Arthur Kaufman, arrived on scene after Officer Gonzales was escorted to the hospital. Sgt. Kaufman stated at trial that he led the investigation of the shooting and was assisted by several NOPD officers. At 5:00 p.m., less than two hours after Sgt. Kaufman received the report of the shooting, support units brought Mr. Harrison to the scene. Several witnesses identified Mr. Harrison: (1) Officer Gubert identified him as the man who fled the vehicle; (2) Ruth and Erin Farmer identified him as the man they saw walking on the levee near their property shortly after the shooting; and (3) Eddie Guillory identified Mr. Harrison as the man who was struggling with Officer Gonzales prior to the shooting. Due to Officer Gonzales's extensive injuries, Sgt. Kaufman did not interview Officer

1



Gonzales until June 2006, at which time Officer Gonzales identified Mr. Harrison as the person who shot him though a photographic lineup.

## PROCEDURAL HISTORY

On June 20, 2006, the State filed a Bill of Information against Eddie Harrison III charging him with attempted first degree murder (La. R.S. § 14:(27)30). Mr. Harrison was found guilty by a jury on March 13, 2008, and the State filed a multiple bill against him on March 17, 2008. On March 19, 2008, the court sentenced Mr. Harrison as a second felony offender to one hundred years at hard labor without the benefit of probation, parole, or suspension of sentence. On June 25, 2009, the Fourth Circuit Court of Appeals affirmed Mr. Harrison's conviction and sentence. On March 26, 2010, the Louisiana Supreme Court denied writs.

On June 23, 2011, Mr. Harrison, through counsel Shawn Higgins, filed an Application for Post-Conviction Relief ("PCR"), requesting an evidentiary hearing. On April 28, 2021, Mr. Harrison filed a second PCR and a motion to stay PCR proceedings pursuant to *Ramos v. Louisiana*. On June 23, 2021, counsel Justin Harrell appeared in court without Mr. Harrison to file a supplemental memorandum in support of Mr. Harrison's PCR. On February 16, 2022, this court denied Mr. Harrison's 2021 PCR, without ruling on the *Ramos* claims. On May 11, 2022, the Fourth Circuit denied Mr. Harrison's writ application. On September 20, 2022, the Louisiana Supreme Court also denied Mr. Harrison's writ application. In its opinion, the Louisiana Supreme Court specifically noted that Mr. Harrison had exhausted his right to state collateral review absent a showing that "one of the narrow exceptions authorizing the filing of a successive application applies." *State v. Harrison*, 2022-00923 (La. 9/20/22), 346 So. 3d 279, 280.

On October 17, 2022 and December 27, 2022, Mr. Harrison filed two additional PCRs. In those filings, Mr. Harrison asserts the following claims:

(1) Petitioner is actually/factually innocent of being a Second-Time Felony Offender as Required by La. R.S. 15:529.1 and Charged in the Multiple Bill of Information Filed on March 17, 2008 (October 17, 2022 PCR, claim #1,)
(2) Petitioner is factually innocent of attempted first degree murder of a police office (December 12, 2022 PCR, claim #1)
(3) Petitioner was Denied Effective Assistance of Counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Equivalent Provisions of the Louisiana Constitution at his Habitual Offender Proceeding (October 17, 2022 PCR, claim #2)
(4) Petitioner was Denied Due Process under the Fifth, Eight, and Fourteenth Amendments to the United States Constitution, and the Constitution of the State of Louisiana Article I Section 2 Due Process of Law when a Surveillance Tape was not Produced (December 12, 2022 PCR, claim #2)

On March 23, 2023, Mr. Harrison also filed a Motion to Correct Illegal Sentence, claiming that his multiple bill sentence is illegal because the court failed to inform Mr. Harrison of his right to remain silent before adjudicating him as a second felony offender. On May 19, 2023, the State filed its Response to Mr. Harrison's PCRs and Motion to Correct Illegal Sentence. On June 12, 2023, Mr. Harrison filed a Position to the State's Response to PCR in which Mr. Harrison requests a stay of the PCR proceedings under *State v. Ramos*.

## DISCUSSION

This court denies Mr. Harrison's request for a relief and stay pursuant to *Ramos*, all his PCR applications, and his Motion to Correct Illegal Sentence.

### A. Request for Relief and Stay Pursuant to *Ramos*

Mr. Harrison requests relief and a stay of this matter pursuant to the decision in *Ramos v. Louisiana*.[1] In *Ramos*, the United States Supreme Court held that nonunanimous jury convictions for serious crimes are unconstitutional under the Sixth Amendment.[2] Here, Mr. Harrison failed to provide any proof that his conviction was non-unanimous, asserting only that the jury was instructed that agreement of ten of the twelve jurors could result in a conviction. Without jury polling slips or other evidence that Mr. Harrison was convicted by a non-unanimous verdict, his claim is without merit.

Moreover, even if Mr. Harrison had provided evidence that his conviction was non-unanimous, the Louisiana Supreme Court held that the *Ramos* rule does not apply retroactively to convictions that became final prior to the *Ramos* decision.[3] Mr. Harrison's conviction became final on March 26, 2010,[4] ten years before the *Ramos* rule from the U.S. Supreme Court. Therefore, Mr. Harrison's conviction cannot be challenged by *Ramos*, regardless of whether it was non-unanimous. Thus, Mr. Harrison's request for relief and a stay pursuant to his *Ramos* claim is denied.

### B. Post Conviction Relief Claims

#### a. Factually Innocent of being a Second-Felony Offender and of Attempted First Degree Murder

In his first claim, Mr. Harrison argues that he is factually innocent of both being a second-felony offender and of committing attempted first degree murder. Procedurally, Mr. Harrison is

---

[1] *Ramos v. Louisiana*, 590 U.S. ___, 140 S. Ct. 1390, 206 L.Ed.2d 583 (2020).
[2] *Id.*
[3] *State v. Reddick*, 2021-01893 (La. 10/21/22), 351 So. 3d 273.
[4] *See* La. Code Crim. P. art. 922(D).

3

not barred from bringing either claim. Ordinarily, PCR claims filed beyond two-years from the date the conviction became final are untimely, unless a narrow exception applies.[5] However, Louisiana Code of Criminal Procedure article 926.2 sets out that:

> A petitioner, who has been convicted of an offense, may seek post conviction relief on the grounds that he is factually innocent of the offense for which he was convicted. A petitioner's first claim of factual innocence pursuant to this Article that would otherwise be barred from review on the merits by the time limitation provided in Article 930.8 or the procedural objections provided in Article 930.4 shall not be barred if the claim is contained in an application for post conviction relief filed on or before December 31, 2022, and if the petitioner was convicted after a trial completed to verdict.

Here, Mr. Harrison asserted his first factual innocence claim on October 17, 2022. Moreover, Mr. Harrison was convicted by a jury, and did not plea guilty. Thus, Mr. Harrison's factual innocence claim is subject to the exception to the PCR time bar laid out in Louisiana Code Criminal Procedure article 926.2.

Substantively, however, Mr. Harrison has failed to provide the court with the clear and convincing evidence required to succeed on a factual innocence claim. Louisiana Code of Criminal Procedure article 926.2 states that a Petitioner must provide evidence that:

> proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.

Here, Mr. Harrison fails to provide evidence of his innocence that rises to the clear and convincing evidence standard. Instead, in both Mr. Harrison's October 17, 2022 and December 27, 2022 PCRs, Mr. Harrison failed to offer any facts to support his innocence of his conviction or of being a second-felony offender. Without evidence to consider his assertions, this court denies both of Mr. Harrison's Factual Innocence claims.

**b.  Ineffective Assistance of Counsel at Multiple Bill Sentencing**

Next, Mr. Harrison's claim of ineffective assistance of counsel at his multiple bill sentencing is untimely filed and without merit. First, Mr. Harrison's claim is procedurally barred because it is untimely filed. PCR applications must be filed within two years from the finality of the conviction.[6] Mr. Harrison's conviction became final when the Louisiana Supreme Court denied writs on March 26, 2010, giving Mr. Harrison until March 26, 2012 to file his PCR. Mr. Harrison

---

[5] *See* La. Code Crim. P. art. 930.8.
[6] *See id.*

filed the PCR with his ineffective assistance of counsel claim on October 17, 2022, well after his time limit had expired.

Moreover, even if Mr. Harrison's ineffective assistance at counsel claim was not procedurally barred, it is without merit. Mr. Harrison first claims that the underlying conviction for which he was multi-billed was not a valid conviction because his guilty plea was unconstitutional. Specifically, Mr. Harrison claims that he was not properly Boykinized before entering his plea in the underlying case. Therefore, Mr. Harrison claims that his sentencing counsel's performance was deficit when sentencing counsel failed to file a motion to quash the multiple offender bill of information.

*Boykin* requires the accused person to give an express and knowing waiver of his constitutional rights to a trial by a jury, to confront his accusers, and his right against self-incrimination.[7] Here, the *Boykin* transcript in Mr. Harrison's underlying case reveals that Mr. Harrison waived each of his *Boykin* rights. Because Mr. Harrison's underlying conviction rested on a proper guilty plea, Mr. Harrison's sentencing counsel had no cause to challenge the multiple offender bill of information in the instant case. Thus, Mr. Harrison's sentencing counsel's assistance was not deficient, and this claim is without merit.

### c. <u>*Brady* Claim over Surveillance Tape</u>

Mr. Harrison claims next that the State violated *Brady* when it lost a potentially exculpatory videotape. However, this claim is procedurally barred because the claim was previously adjudicated and is now untimely filed. On appeal, the Fourth Circuit ruled that Mr. Harrison, "has failed to show that the videotape in question, had it been available for trial, would have undermined confidence in the outcome of the trial.[8] Moreover, Mr. Harrison's claim is untimely.[9] Thus, this claim is procedurally barred.

### C. <u>Motion to Correct an Illegal Sentence Claim</u>

Finally, Mr. Harrison claims that his sentence is illegal. This claim is without merit. In its 2009 ruling, the Fourth Circuit determined that Mr. Harrison's sentence was not excessive.[10] This court agrees.

---

[7] *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed. 2d 274 (1969).
[8] *State v. Harrison*, 2008-1110 (La. App. 4 Cir. 6/25/09), 16 So. 3d 447, 457 (2009).
[9] *See supra* p. 4-5.
[10] *Harrison*, 16 So. 3d at 459.

An illegal sentence may be corrected at any time.[11] Mr. Harrison was sentenced to one hundred years without the benefit of probation, parole, or suspension of sentence. At the time of the commission of this crime, the sentencing range for a second offender convicted of attempted first degree murder was twenty-five to one hundred years.[12] Mr. Harrison was sentenced to one-hundred years, a sentence that falls within statutorily provided sentencing limits. Thus, Mr. Harrison's Motion to Correct Illegal Sentence is denied.

For the foregoing reasons, Mr. Harrison's Applications for Post-Conviction Relief are **DENIED**.

Furthermore, Mr. Harrison's Motion to Correct Illegal Sentence is **DENIED**.

New Orleans, La., this 26th day of _____, 2023.

HONORABLE, JUDGE NANDI F. CAMPBELL

---

[11] La. Code Crim. P. art. 882.
[12] *See* La. R.S. 14:30(C)(2) (2006); La. R.S. 14:27(D)(1)(a) (2006); La. R.S. 15:529.1(A)(1)(a) (2006).

IN THE
CRIMINAL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LOUISIANA
******

OCT 11 AM 7:56

DOCKET NUMBER: 465-700               SECTION/DIVISION: "G"

MOVANT:  EDDIE HARRISON

- VERSUS -

STATE OF LOUISIANA

FILED: _____     _____ CLERK

## NOTICE OF INTENT TO SEEK WRIT

NOW INTO COURT COMES movant, **EDDIE HARRISON (#411964)** , acting pro se' and moves this Honorable Court for an Order granting authorization to apply to the: __FOURTH__ Circuit Court of Appeals; from an order dated: **26 SEPT.2023** denying: __SUBSEQUENT POST CONVICTION RELIEF APPLICATION.__

Respectfully Submitted,

s/Eddie Ho—

Date: October 4th ,20 23.     **Eddie Harrison, DOC #411964**
David Wade Correctional Center
670 Bell Hill Road -Unit: __H1-B__
Homer, LA 71040-2150

## O R D E R

CONSIDERING THE ABOVE AND FOREGOING MOTION:

IT IS ORDERED THAT the movant be and he is hereby authorized to take Supervisory Writ to the ___4th___ Circuit Court of Appeal; for the State of Louisiana, returnable on or about the ___11th___ day of __November__ , 20 23 .

READ, RENDERED, AND SIGNED ON THIS 11th DAY OF October ,20 23.

_____
DISTRICT COURT JUDGE

received
10/11/23 eh

NO. 2023-K-0753

COURT OF APPEAL, FOURTH CIRCUIT

STATE OF LOUISIANA

STATE OF LOUISIANA

VERSUS

EDDIE HARRISON III

IN RE:          EDDIE HARRISON III

APPLYING FOR: SUPERVISORY WRIT APPLICATION

DIRECTED TO:  HONORABLE NANDI CAMPBELL
              CRIMINAL DISTRICT COURT ORLEANS PARISH
              SECTION "DIVISION G",

**WRIT DENIED**

The writ application of the Relator, Eddie Harrison III, seeks review of the

district court's September 26, 2023 judgment, denying Relator's two successive

applications for post-conviction relief and his motion to correct an illegal sentence.

The Relator's writ application is denied.

New Orleans, Louisiana this 11th day of December, 2023.

*RDJ*

JUDGE RACHAEL D. JOHNSON

*RML*

JUDGE ROSEMARY LEDET

*DNA*

JUDGE DALE N. ATKINS

A TRUE COPY
NEW ORLEANS
DEC 11 2023
CLERK
COURT OF APPEAL FOURTH CIRCUIT

# The Supreme Court of the State of Louisiana

**STATE OF LOUISIANA**

**VS.**

No. 2024-KH-00056

**EDDIE HARRISON, III**

IN RE: Eddie Harrison, III - Applicant Defendant; Applying For Supervisory Writ, Parish of Orleans Criminal, Criminal District Court Number(s) 465-700, Court of Appeal, Fourth Circuit, Number(s) 2023-K-0753;

**April 23, 2024**

Writ application denied - Applicant has previously exhausted his right to state collateral review. See State v. Harrison, 2022-00923 (La. 9/20/22), 346 So.3d 279.

PDG

JLW

JDH

SJC

JTG

WJC

JBM

Supreme Court of Louisiana
April 23, 2024

Chief Deputy Clerk of Court
For the Court

SUPREME COURT OF LOUISIANA

No. 22-KP-0923

STATE OF LOUISIANA

v.

EDDIE HARRISON

ON SUPERVISORY WRITS TO THE CRIMINAL
DISTRICT COURT, PARISH OF ORLEANS

**PER CURIAM:**

Denied. Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As to his remaining claims, applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2.

Applicant has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, *see* 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art. 930.8. Notably, the legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Applicant's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, applicant has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

# EXHIBIT

1    A     The identification process involving Officer

2    Gubert, I was not involved in; however, the

3    identification process, the second identification

4    process, myself and Sargent Lawrence Green, who is now

5    deceased.

6        Q     And what witnesses did you talk with as part

7    of that identification process?

8        A     None.

9        Q     None.  What about Officer Green?

10       A     He didn't speak with anybody either.

11       Q     To the best of your knowledge on the scene

12   were any other witnesses shown Mr. Harrison in a show

13   up line up?

14       A     Yes, sir.

15       Q     Okay.  Do you know who those witnesses were?

16       A     I believe, yes, I do.  Yes, I do.

17       Q     Who were those witnesses?

18       A     Ruth Farmer and I believe, Erin Farmer.

19       Q     Do you know what officers conducted that

20   portion of identification process?

21       A     That would be, I believe, Detective Anthony

22   Small and possibly Detective Decinda Barnes.  Detective

23   Small is now retired.

24       Q     Was there a witness named Eddie Guillory?

25       A     There was.

26       Q     Did you have any contact with Mr. Guillory?

27       A     I personally did not.

28       Q     Do you know if he participated in a show up

29   line up?

30       A     It's my understanding he didn't participate

31   in a show up line; however, when Eddie Harrison was

32   brought back to the scene, Eddie Guillory saw him and

43

369

1    pointed him out as the person who was struggling with

2    Officer Gonzales, prior to Officer Gonzales being shot.

3         Q    Who did Eddie Guillory point that out to?

4         A    I'd have to refer to the report.  I'm not

5    exactly sure.  One of the investigators on the scene.

6    I'm not sure if it was Gus Bethea, Ronnie Ruiz, I'd

7    have to look.

8         Q    Now you said a weapon search was conducted

9    over several days following the incident?

10        A    Over two consecutive days, yes.

11        Q    Okay, and what specific methods were used?

12        A    Again, physical, meaning manpower, searing

13   on the levy, K-9, we used the dive team, go in the

14   river at a certain point to no avail.

15        Q    I believe you testified the dive team

16   concluded that it was too dangerous at that particular

17   time?

18        A    They did go in and went about twenty feet

19   out from the bank and at that point they determined it

20   was too hazardous.  Visibility was near zero according

21   to what they were saying, along with debris in the

22   water.

23        Q    The clothing that was depicted, the pants in

24   State's Exhibit Number 10 and 11, the photographs you

25   were shown and were published to the jury --

26        A    Yes, sir.

27        Q    Those pants were subject of some type of

28   testing?

29        A    That was requested, yes.

30        Q    Do you know what type of testing was

31   requested?

32        A    No.  I don't remember if it was either DNA

                                                    44

370

N.O.P.D. ITEM NO. E-21844-06
EDDIE GUILLORY

## NEW ORLEANS POLICE DEPARTMENT
## BUREAU OF INVESTIGATIONS
## HOMICIDE SECTION
## N. O. P. D. ITEM NO. E-21844-06

Today is Monday, May the 22nd, 2006. The time now is 5:04 p.m. This statement is being taken under New Orleans Police Item No. E-Echo 2-1-8-4-4 - 0-6. This statement is in reference to a Signal 108 that occurred May 22nd, 2006 at approximately 3:07 p.m. at the intersection of Slidell and Verret Street. Present for this statement is myself, Detective DeCynda C. Barnes and Detective Winston Harbin, both assigned to the New Orleans Police Homicide Division. Also present for this statement is Mr. Eddie Guillory.

Q: Mr. Guillory, could you please state and spell your first and last name?
A: E-D-D-I-E  G-U-I-L-L-O-R-Y.

Q: And your date of birth?
A: ▮▮▮▮▮▮

Q: Your race?
A: White.

Q: And your home address?
A: ▮▮▮▮▮▮

Q: And your home telephone number?
A: ▮▮▮▮▮▮

Q: Mr. Guillory, in your own words, could you please relate to me your knowledge regarding the police shooting that occurred at the intersection of Opelousas and Slidell Street.

*Mr. Guillory's Statement*

Page 1 of 8

N.O.P.D. ITEM NO. E-21844-06
EDDIE GUILLORY

A: I was walking into the Opelousas Market and I seen two guys run out the corner of . . . of Valette to Opelousas . . . Verret to Opelousas . . . and I turned around for a brief second cause I thought it was two people playing and I turned around . . . and I heard three gunshots. And . . . the guy was shot three times and he hit the ground. The young man that did it kept running.

Q: And did you get a chance to see who was doin' the shooting?
A: Yes I did.

Q: Could you describe him for me.
A: Heavy-set . . . white tee . . . uh, white tank top . . . uh, braided hair . . . and black jeans and . . . if I remember correctly . . . white tennis shoes.

Q: About how tall . . . was he?
A: Um, probably about 6 foot.

Q: And about his weight . . . how uh, heavy?
A: Weight . . . probably about 180.

Q: And his skin complexion?
A: Black.

Q: And after you observed the subject . . . who was he uh . . . , fighting with?
A: The police officer.

Q: And did you get a look at the police officer?
A: Yes I did.

Q: Could you describe that police officer for me?
A: He was probably about 6' 2" . . . 6' 3", white and . . . he . . . probably about medium build . . . dark hair . . .

N.O.P.D. ITEM NO. E-21844-06
EDDIE GUILLORY

Q: And did you see the . . . the actual struggle?
A: Yes.

Q: And in that struggle, what occurred?
A: Uh, they were grabbin' each other . . . tusslin' around with each . . . with each other and . . . then the . . . three gunshots happened.

Q: Did you hear the police give any verbal commands to the subject?
A: Uh, I heard some . . . some screaming, yes. But I really couldn't tell you what was said. I mean, it was a lot of yelling . . .

Q: And . . .
A: . . . on both ends. I mean . . . I really couldn't make . . . anything out.

Q: . . . and in proximity, how close were they to each other?
A: Uh . . . , very close . . . very close . . . uh, within feet . . . feet of each other . . . two feet . . . one foot . . .

Q: And . . .
A: . . . closer, possibly.

*[handwritten: Couldn't really see what happened]*

Q: . . . and did you see who did the shooting?
A: Yes, I did.

Q: Which one of 'em?
A: It was the black man.

Q: And . . . did you see his weapon?
A: Uh, no . . . actually, I did not see the weapon.

*[handwritten: Didn't see the Shooting]*

Q: Did you see the flames coming from the weapon?
A: I . . . I jus' heard the shots and . . . he was gone.

Page 3 of 8

N.O.P.D. ITEM NO. E-21844-06
EDDIE GUILLORY

Q: And which way did he flee?
A: Uh, up Opelousas . . . um, towards . . . towards Teche.

Q: And what happened to the police officer?
A: He was layin' on the ground . . . he was very injured.  He was on the ground.

Q: Did . . . other police officers arrive or did . . .
A: Very quickly . . .

Q: . . . anyone come to his aid . . . ?
A: Well uh, a pedestrian went up to him and grabbed him and was . . . and was talkin' to him . . .

Q: And what . . .
A: and you know . . . tryin' to calm him down . . . tellin' him he was gonna be all right.  And they had . . . quite a few other people standin' around.

Q: Okay.  After . . . today, did you see the gentleman . . . again that did the shooting?
A: Did I . . . can you repeat the question.

Q: Did you see the individual that did the shooting again any time today?
A: No . . . not today, no.

Q: Did I . . . how did me and you come in contact with each other?
A: Uh, I asked two police officers down the street that I seen somethin' and who I should talk to . . . and they directed me to you.

Q: And that was in the 500 block of Opelousas . . . Street?
A: Opelousas . . . yes ma' am.

N.O.P.D. ITEM NO. E-21844-06
EDDIE GUILLORY

Q: And after you informed me of that, I took a . . . verbal statement from you
. . . ?
A: Yes you did.

Q: And what else did we do?
A: We uh . . . we uh . . . checked on the witness to see if that's who it was.
I mean the uh . . .

Q: On the . . .
A: . . . the suspect to see if that was him or not . . .

Q: Okay, so when . . .
A: (inaudible) identification.

Q: Explain that . . .
A: Explain . . .

Q: . . . how you did . . .
A: . . . how he did it?

Q: Yeah.
A: Okay. They had me stand behind some gentlemen . . . and they pulled him
out the car . . . they walked him in front of me, asked me if that was him or
not . . . and I said, "Yes." And they escorted him back to the car.

Q: So the individual that you told me, "Yes," that's the individual that you
saw fire three shots at the police officer?
A: The man they showed me was definitely the man that did it . . . that pulled
the trigger.

Q: And do you know the individual . . . have you ever seen him before?
A: I've seen him around . . . jus' around the neighborhood . . . but I . . . I don't know him.  I've jus' . . . I've seen him a few times.

Q: And do you know anything else about him?
A: No . . . no, I don't.

Q: Have you known him to get in any type of trouble in the area?
A: No . . . like I . . . jus' at the store, mainly, you know.  From the store, get lunch and . . . you see the same people a lot, you know.

Q: So it would be safe to say that he hangs around the Opelousas Street store?
A: Yeah, yes . . . yes.

Q: Any questions uh, Detective Harbin?

QQ: This struggle, were they on their feet the whole time?
A: Yes . . . yes.

QQ: Okay.  What position were you in when you were watching this?
A: Um, I was . . . actually, I was about to walk into the door of the store and . . . then I . . . that's when I seen it.  I was kinda by the mailboxes and I was facin' straight towards him.

QQ: Okay.  Were they on your side of the street or across the street?
A: They were on my side of the street.

QQ: Okay.  So you were lookin' straight down the sidewalk?
A: Right.

N.O.P.D. ITEM NO.  E-21844-06
EDDIE GUILLORY

QQ: 'Bout how far?      *Too far t̶o̶ id* (handwritten)
A: Uh . . . it had to ~~be maybe 40 yards.~~ (circled)

QQ: Okay.  And how long did they struggle before the shots . . . ?
A: Uh, it wasn't long at all . . . seconds . . .

QQ: And you never saw the weapon . . . ?
A: . . . ~~very brief~~ . . . not . . . ~~did not see the weapon~~, no . . . ~~I jus' heard the shots and then, he was gone~~.

QQ: Okay.  You heard the shots, did the policeman fall?
A: Yes.

QQ: Okay.  And the perpetrator fled?
A: Fled . . . yes.

QQ: Okay.  Um . . . , could you tell from where you were standin' that it was obviously a police officer?
A: Oh yes . . . yes.

QQ: What was . . . what was obvious about him?
A: The belt . . . you could see the police belt and I . . . I seen the patches on his arms.

QQ: Okay.  And uh, let's see . . . I think that covers it, sir.
A: Cause his back was facin' me.     *Police officer blocking his view* (handwritten)

Q: The police officer's back was facing you?
A: Yeah . . . yes.  And then when they turned a little bit, I seen the badges and I . . . and I definitely recognized the belt, you know.

N.O.P.D. ITEM NO. E-21844-06
EDDIE GUILLORY

Q: Okay. Is this statement true to the best of your knowledge?
A: To the best of my knowledge, yes it is.

Q: Did anyone force or coerce you to give this statement?
A: No, anybody did not.

Q: Are you givin' this statement on your own free will?
A: Yes ma'am.

Q: Is there anything you wish to add or delete from this statement?
A: Not at all.

Q: This statement is now concluded. The time now is 5:12 p.m., 5:12 p.m., Monday, May the 22nd, 2006.

I, Karen Barbaro, do hereby certify that the foregoing statement was transcribed by me and is true and correct to the best of my ability and understanding.

_____
Karen Barbaro
08/09/2006

1    This incident initiated with a traffic

2 stop, is that correct?

3   A  Yes, sir.

4   Q  Now in that police vehicle, it was a fully

5 marked vehicle, you said?

6   A  Yes.

7   Q  Were you the driver or the passenger?

8   A  The driver.

9   Q  And Officer Gubert was in the front

10 passenger seat?

11   A  Yes.

12   Q  Where did you first notice the vehicle that

13 you subsequently stopped?

14   A  I'm trying to think of the street name.

15 It's one of the streets General Meyers turns ino going

16 towards the river.

17   Q  Okay.  Would that be Newton Street?

18   A  That's it, Newton.

19   Q  And approximately how far did you follow

20 this car?

21   A  About a block, block and a half maybe.  He

22 was crossing Newton Street when we observed him.

23   Q  Okay, and the driver, did he pull over

24 immediately?

25   A  Yes.  When I turned on my lights, yes.

26   Q  When you left the police vehicle what side

27 of the detained vehicle did you approach?

28   A  The driver's side.

29   Q  And Officer Gubert, do you know where she

30 was?

31   A  Passenger side.

32   Q  You had conversation with the driver of the

645

1    vehicle?

2        A      Yes.

3        Q      Do you know if she had conversation with the

4    passenger?

5        A      I'm not sure.

6        Q      At some point did she leave the passenger

7    side of the vehicle?

8        A      No.  I don't remember her leaving.

9        Q      Okay.  What first drew your attention to

10   Eddie Harrison?

11       A      When she told me that he was running.

12       Q      Now this traffic stop, that was the only

13   reason you had stopped this vehicle, is that correct?

14       A      Yes.

15       Q      There was no connection with any other

16   crime, any other activity perceived to be illegal or

17   dangerous?

18       A      No.

19       Q      And Eddie Harrison was not the driver of the

20   vehicle, was he?

21       A      No.  He was a front passenger.

22       Q      When Eddie Harrison left the car and you

23   were told by Officer Gubert that he had left the car

24   and was running, why did you pursue him?

25       A      Because he was running.

26       Q      Had you had any conversation with him?

27       A      No.

28       Q      Had he given you any reason to suspect he

29   was participating in any illegal activity?

30       A      No, except for when he ran.

31       Q      That's an illegal activity?

32       A      Usually everybody that ran, my suspicion is

75 |

596

```
1    A    No.

2    Q    Why not?

3    A    Because at which point the passenger of the

4    vehicle got out the car and started running and my

5    partner told me that he was running.  So, I started

6    chasing him, the passenger.

7    Q    And where did you chase him to?

8    A    Down Verrett Street towards Opelousas and

9    then Opelousas towards the river.

10   Q    And what happened once you got to Opelousas?

11   A    Started catching up with him.  When I got up

12   with him, I had my baton in my hand knowing that

13   usually everything starts, meaning when I catch up with

14   them, it always ends up in a fight.

15   Q    So, it would be safe if you had it in case

16   you needed it?

17   A    Yes.

18   Q    Okay.  Well, what was it about this

19   individual that made you feel that you needed to have a

20   baton?

21   A    He was a lot stockier than I was.

22   Q    Did you ever actually use your baton?

23   A    No, sir.

24   Q    Now I'm going to direct you to the point on

25   Verrett Street.  Did you turn onto Opelousas after

26   that?

27   A    Yes.

28   Q    And what did you observe once you turned

29   onto Opelousas?

30   A    That I was catching up with him.

31   Q    And were you able to catch up with him?

32   A    Yes.
```

62

583

1       Q     Okay.  Now when this foot chase began, how

2   far in front of you was Eddie Harrison?

3       A     By the time I started running, he was

4   probably roughly maybe a half a block or a short end of

5   a block.

6       Q     Half a block.  The block between Slidell and

7   Opelousas on Verrett?

8       A     Yes.

9       Q     So, half a block.  All right.  Half a block

10  could vary from block to block as to what the distance

11  is, correct?

12      A     It was a half a block.

13      Q     Okay.  Now, he was a half a block ahead of

14  you.  On the corner of Opelousas and Verrett Street on

15  the river side, the river Jefferson Parish side of

16  Opelousas then Verrett, do you remember what kind of

17  structure was there?

18            MRS. DOUGLAS:

19            Judge, I'm going to object to, it's kind

20      of vague.

21            THE COURT:

22            Sustained.

23  BY MR. DONNELLY:

24      Q     Okay.  On the corner of Verrett and

25  Opelousas, did you see Eddie Harrison make that turn?

26      A     Yes.

27      Q     By that time you were still in pursuit?

28      A     Yes.

29      Q     How far were you behind him by the time he

30  made the turn?

31      A     A few yards.

32      Q     You had caught up from a half a block to a

598

1   few yards?

2        A    Yes.

3        Q    Did you lose sight of him at any time?

4        A    No.

5        Q    When he turned the corner did you lose sight

6   of him for even a moment when he turned the corner?

7        A    No, because he was running down the sidewalk

8   and I was running in the middle of the street.  So, my

9   angle, I always have my eye on him.

10       Q    When he was running, did you notice his

11  hands?

12       A    No.

13       Q    So you don't know if he was carrying

14  anything in either of his hands?

15       A    Well, when I'm running, I'm not going to

16  look at his hands.  I'm looking at, you know, body

17  movement, you know, keeping, you know, back of his

18  head.

19       Q    Did you see a gun at that point?

20       A    Not at that point when he turned the corner.

21       Q    When you turned the corner onto Opelousas,

22  were there other people in the area?

23       A    I was focused in on him.

24       Q    So you don't know if there were pedestrians

25  on the side walk in the 500 block of Opelousas?

26       A    It was 3:00 in the afternoon.  So, I

27  presume, yes.  There were people around.

28       Q    Okay.  Now shortly after you turned the

29  corner, did you catch up to Eddie Harrison?

30       A    Yes.

31       Q    And I believe you testified you had your, I

32  guess what I'd call a billy club but I guess that's an

78

500 opelousas st, new orleans, la - Google Maps



**Google** Maps

Address **500 Opelousas Ave**
**New Orleans, LA 70114**

①PO  First observed car

② vehicle stopped

→ Gonzalez followed Δ on foot

- -> Gubert drove with Hall, heard gunshot, headed towards river

③ Gonzalez found bleeding, interviewed Eddie Guillery

→ ~~directed~~ Direction Δ was observed heading

④ Stacy, Erin, Ruth Farmer interviewed - heard gunshots at
this location



ITEM NUMBER: E-21844-06
LOCATION: 500 BLOCK OF OPELOUSAS AVENUE
DATE: 05/22/06
ORIGINAL: 108
PAGE ____ OF ____
DRAWN BY: EDWARD DELERY

NOT DRAWN TO SCALE
OVERVIEW OF SCENE

UNOFFICIAL COPY
INCOMPLETE

* Map *

TO MISSISSIPPI RIVER



TO  MISSISSIPPI  RIVER ➡

607  SLIDELL

CURB  LINE

MUD, GRASS, SHELL  SHOULDER

ROAD  BED

TOYOTA
LA  LIC.
OVJ  641(03/08)

ROAD  BED

MUD, GRASS, SHELL  SHOULDER

CURB  LINE

600  BLOCK  SLIDELL  STREET

N

TO  OPELOUSAS
AVENUE

VERRET STREET

ITEM NUMBER: E-21844-06
LOCATION: 500 BLOCK OF OPELOUSAS AVENUE
DATE: 05/22/06
SIGNAL: 108
PAGE _____ OF _____
DRAWN BY: EDWARD DELERY

UNOFFICIAL
COPY

* Map *

INCOMPLETE

NOT DRAWN TO SCALE
SCENE #1 ENLARGEMENT



1    old term now, your night stick, your asp; you had that

2    drawn?

3         A      Yes.

4         Q      And you normally carry that where?

5         A      Right behind my gun, on my right hip.

6         Q      And what was the purpose for you having the

7    baton in your hand?

8         A      Well, he's was a lot stockier than I was and

9    all the chases I've been in that I caught the person,

10   always end up in a fight, and him being bigger than me,

11   and the training that I got with the baton, I figured

12   it would help me out in detaining him.

13        Q      At any time did you use the baton?

14        A      No.

15        Q      And why was that?

16        A      Because he turned around quickly with a gun

17   in his hand.

18        Q      He came to a full stop?

19        A      He was in mid motion, mid stride when he

20   turned with the gun in his hand and pointed it at me.

21        Q      Was the gun fired before you came in contact

22   with him?

23        A      No.

24        Q      You had already come in physical contact

25   with Eddie Harrison when you heard or felt the first

26   shot?

27        A      I had grabbed the gun and tried to wrestle

28   it out of him when I was shot.

29        Q      You indicated you were shot four times?

30        A      Yes.

31        Q      Were you aware that you were starting to

32   bleed?

                                     79

NEW ORLEANS POLICE DEPARTMENT
RESISTING ARREST REPORT

CHAPTER 1.3                                                                 PAGE 3 OF 3

## NARRATIVE:

On Monday, May 22, 2006 at 3:07 p.m. Officers Andres Gonzalez and Rebecca Gubert manning unit 412, had the occasion to conduct a traffic stop at Verret and Slidell st., the reason for the stop was tinted windows. The Officers approached the vehicle and asked the operator for his drivers license. The driver stated he could not locate his license on his person. The Officers then asked the passenger sitting in front seat for his identification. The driver was then removed from his vehicle and placed in handcuffs for the officers safety by Officer Gubert. The driver later identified as Joshua Hall black male date of birth 01 01 1989 was then placed in the rear seat of the Officers unit. The passenger then fled from the vehicle on foot with Officer Gonzalez in pursuit. Officer Gubert stated she followed her partner and the unknown black male subject in the police unit. Officer Gubert stated when she arrived at Opelousas and Verret St. she heard several gunshots . Officer Gubert stated she observed her partner Gonzalez lying on the ground in the 500 Blk. of Opelousas St. bleeding from his head and facial area. Officer Gubert stated she then notified the dispatcher that her partner had been shot. signal 108, officers life in danger. Officer Gubert stated that hetr partner had been shot by the black male subject he was chasing. Sergeant Robinson along with several fourth district officers arrived on the scene and rendered firast aid to Officer Gonzalez. Officer Gonzalez was transported the Elwood Trauma Center by the Health Department Abulance. The scene was secured by Sergeant Robinson and several other Fourth District Officers. Sergeant Robinson observed spent shell casing on the ground in the 500 Blk. of Opelousas St. in front of the laundry mat were the incident occurred. Sergeant Robinson then notified the channel four dispatcher that a Crime Lab Unit was needed on the scene and to notify command desk to make the proper notification on a police shooting. The perpetrator was described as a black male, about 20 to 25 years old, 5 '8 240 pounds, wearing jeans shorts and a black tee shirt. The suject also had short twists hair style. A short time later a subject matching the description was apprehended at Slidell and Brooklyn St. hiding underneath a train that was parked on the train tracks. The subject was later identified as Edward Allen Harrison black male date of birth 08 20 1982. The subject was escorted back to the scene and was positively identified as the perpetrator who fled from the vehicle at Slidell and Verret St. by Officer Gubert. Edward Harrison was booked by homicide with R.S. 14 27 30 attempted murder 14 108 resisting arrest by flight and 14 95.1 a felon in possession of a firearm. Hall was charged with accessory after the fact and the traffic violations.

USE NARRATIVE CONTINUATION IF NEEDED

REPORTING SUPERVISOR

| RANK AND LAST NAME | FIRST NAME | SOCIAL SECURITY NUMBER |
|---|---|---|
| Sergeant Robinson | Tyrone | 425 15 3205 |
| ASSIGNMENT | | |
| 4th District | | |
| SIGNATURE | | |
| | | |

DISTRIBUTION (WITHIN 24 HOURS)
ORIGINAL – PUBLIC INTEGRITY BUREAU
COPY – UNIT COMMANDER
COPY – DIVISION COMMANDER
COPY – BUREAU ASSISTANT SUPERINTENDENT
COPY – SUPERINTENDENT

*Exhibit 1*





**BEXAR COUNTY**
**CRIMINAL INVESTIGATION LABORATORY**
7337 Louis Pasteur
San Antonio, Texas 78229-4565
(210) 335-4100
FAX (210) 335-4101



**TRACE EVIDENCE REPORT**

June 22, 2007

Special Agent Mike Hutton
Bureau of Alcohol, Tobacco, Firearms and Explosives
1 Galleria Blvd., Suite 1700
Metairie, Louisiana 70001-2082

CIL #: **07-03274**
ATFE #: **777030-06-0100**
Subject(s):
Eddie Harris-
Felon with Firearm

## EVIDENCE RECEIVED:

Evidence received by Federal Express (7929 9894 0080) on June 06, 2007

Item 1:     One (1) Gunshot Residue (GSR) Collection Kit- Eddie Harris

## RESULTS:

The submitted gunshot residue (GSR) collection kit was examined by scanning electron microscopy (SEM) and by energy dispersive x-ray (EDX) analysis.

One (1) microscopic particle containing lead and barium was detected on the palm of the right hand of Eddie Harris. Two (2) microscopic particles containing lead and barium were detected on the palm of the left hand of Eddie Harris. No microscopic particles containing any combination of lead, barium or antimony were detected on the back of the right or left hand of Eddie Harris.

Based on the morphology and elemental composition of these particles, Eddie Harris may have discharged a firearm, handled a discharged firearm or was in close proximity to a discharged firearm.

## REMARKS:

No microscopic particles containing any combination of lead, barium or antimony were detected on the sampling device labeled as "Control".



*GSR*1*

**ORLEANS PARISH DISTRICT ATTORNEY, CIVIL RIGHTS DIVISION
CONVICTION REVIEW APPLICATION QUESTIONNAIRE**

wouldconclusively prove that you did not commit the crime.

2) A DNA test which a lab could perform which would point to someone elsehaving committed the crime.

3) A DNA test on the crime scene evidence which could be put in the national DNA database of convicted felons and which might match to a convicted felonshowing that that person actually committed the crime.

4) A key state witness against you at the time you were convicted who has now recanted his or her testimony. By "recanted," we mean that the witness is nowsaying that he or she lied against you before, or was mistaken before, and thatthey now are saying something different that shows you are innocent.

5) A new witness who has recently come forward, and who did not testify before, who can now testify that you are innocent. This can be someone whosaw the crime and says it was someone else who they saw do it, or someone who provides you with a solid alibi because they were with you somewhere else when the crime occurred.

6) Other new science other than DNA, such gunshot residue analysis or new arson science, which could be performed on the crime scene evidence and which would show that you are innocent. (Note: lead bullet analysis and arson science have greatly advanced in recent years. Many old methods thatmight have been used to convict you are now considered inaccurate. If you were convicted as a result of arson science or gunshot residue analysis, newstudies showing those methods were flawed could constitute newevidence).

7) Evidence that your lawyer did not present that could have proven you innocent.


**Note: The above list is not a complete list of examples and this type of evidence does not necessarily demonstrate actual innocence/wrongful conviction in every case. The list is included simply to provide some examples of evidence the jury didnot hear which could, depending on the facts of your case, be used to demonstrate actual innocence or that you were wrongfully convicted.


Having read the examples of "new evidence," please answer question 49describing the new evidence in your case:

(If you are writing to the CIU claiming you are wrongfully convicted, but not actually innocent OR received a disproportionately and/or unfairly



"Witnesses don't lie," says Jennifer Dysart, an associate psychology professor at John Jay College of Criminal Justice. "Rather, they are subject to an error in their reproduction of reality."

Studies show that just 30 minutes after an event we already start to mix up the details—much like a dream, the details are still clearly present in our consciousness shortly after we wake up but they become more and more hazy as the morning wears on.

The brain fills the resulting "blank spots" with data that fit the story—just as we immediately complete the sequence "1, 2, 3, x, 5" by adding a 4. It's simply "logical," and alternative explanations aren't readily available.

## Can I trust my memories?

**W**e create our memories ourselves. They do not necessarily correspond with what has happened before in the outside world," explains neuropsychologist and memory researcher Hans Markowitsch. As part of a study conducted at Western Washington University in Bellingham, Washington, students were surveyed about memories from childhood. Each of the participants was presented with several real and one fictitious event. During the first interview none of the subjects could recall the fictitious event. But in a second interview 20% recalled details of this fabricated incident, and some even mentioned names of people who were allegedly present. Reason: If something is presented to us vividly, as it was in the study, it blurs the line between fiction and reality: "Then it becomes possible for you to store the occurrence as a genuine recollection without having actually experienced the event," says legal psychologist Günter Köhnken.

Darkness + the sound of an accident + limited sight + hatred of racers = racing. "Our perception is driven by subconscious hopes and goals. We usually see only what confirms our intentions," says New York University social psychologist Emily Balcetis. By the time the witnesses had been questioned by the police, the "fitting" truth had taken root in their minds…

For criminologists such "invented" realities don't come as a surprise. They are happening even while you read this, albeit on a smaller scale: Approximately every three seconds you are blind for 150 milliseconds—whenever you blink to keep the tear film of your eyes intact. Only if you really focus on it will you notice the brief interruption. Normally the visual film is not "jerky" because the brain replaces the instant of darkness with a suitable sequence from memory.

The reality in the brain doesn't arise as a reflection of reality, but rather as a glimpse of it through a keyhole. Illusionists like David Blaine turn the spectator's brain into an accomplice: They position the keyhole so skillfully that viewers experience their trick as reality. "Everything that we perceive is a manipulator of our consciousness," says psychologist Daniel Kahneman.

## WHY DO CHILDREN SEE BETTER THAN ADULTS?

Each human eye possesses more than 126 million color and contrast receptors, and these transmit data more than 11 million times a second. But the brain can really only process 40 of these impressions, so all the rest end up in the virtual trash bin. It's like judging a novel after reading just four words. But for our brain this "sloppiness" is not a problem, since it concentrates on the order—rather than on the understanding: Its daily life is a single and rarely

interrupted sense of achievement: "I know this, I understand that, these fit into that compartment." The brain checks off 99.9% of all impressions this way—regardless of whether they are true or not. "This scan is only disturbed by impressions that are unexpected, frightening, or especially desirable," says Balcetis.

Like sleepwalkers, we are steered through life by our brains: "It takes only a tenth of a second to render all sorts of judgments about a face that you've never seen before," explains Alexander Todorov, a psychologist at Princeton University. In the process, it's not only gender, age, and mood that are taken into account, but also



## Why are perpetrators invisible?

**O**nly a thumbnail-size portion of our field of view is actually sharp—the farther something is from our focus, the more the contrasts are blurred. Normally our gaze constantly sweeps back and forth and our brains then stitch the individual components together to compose a thorough image. That's why we are subject to the illusion that we see everything clearly. During a dangerous situation like the one in the photo above, a gun attracts our attention in such a way that the eyes no longer pan. The face at the edge of the focus remains blurred. For this reason victims are often unable to recall such details later on—although the perpetrator may have even been standing directly in front of them.

Exhibit a

Getty/UG Science Photo Library (Flickr)

1        your name is called.  Gentlemen, please make

2        sure that all witnesses are out of the

3        courtroom.

4            (DET. GUS BETHEA, after having been

5        first duly sworn, did testify as follows:)

6   BY MR. DEBLANC:

7        Q    Sir, could you please identify yourself

8   for the record?

9        A    Detective Gus Bethea.

10       Q    And Detective Bethea, where are you

11  currently employed?

12       A    Saint Tammany Parish Sheriff's office,

13  homicide.

14       Q    Back on May 22, of 2006, who were you

15  employed with?

16       A    New Orleans Police Department, homicide.

17       Q    And during that time were you called out

18  to participate in the investigation of the attempted

19  murder of Officer Andre Gonzales?

20       A    Yes, sir.

21       Q    Did you have the opportunity to meet

22  with the owners of Westside Cleaners?

23       A    Yes, sir. I did.

24       Q    And could you tell us why did you meet

25  with those people?

26       A    They informed us, while we were on the

27  scene, that they had a video surveillance system

28  that was pointed out of their front window, which

29  was right next to, just adjacent to 511 Opelousas

30  where the shooting had taken place.  I reviewed the

31  video footage while it was in their recording room,

1    their technology room, and during that time, I
2    observed two glimpses. A glimpse of a black male
3    and a glimpse of a blue shirt pass by the window,
4    and that's about all. It was probably within a frame
5    in length, in time length of the video.
6         Q       Detective, the recording equipment that
7    you looked at, was that analog or digital?
8         A       It was analog.
9         Q       And what did you do with the
10   surveillance after reviewing it?
11        A       They voluntarily surrendered the VHS
12   cassette to me. I took the cassette and relocated
13   to Harrah's Casino several days later. Harrah's
14   Casino had set up some equipment where we would be
15   able to dub the VHS. The VHS was dubbed and at that
16   time, Harrah's did, Harrah's Casino explained to me
17   that the footage couldn't be slowed down because we
18   tried enhancing it using their equipment because of
19   the length of the video footage was only less than a
20   frame; within one frame and they couldn't enhance
21   that frame anymore. I took that video back to the
22   office which, at that time, our office was a trailer
23   which was shared by numerous divisions including
24   asset forfeiture, homicide, some narcotics units,
25   and some commanders. Within that I turned in the
26   videos into an interoffice mailbox, which is what we
27   use to exchange documents and such within the such,
28   within the office because we were all on different
29   schedules. Some units were working nights, whereas,
30   some would work during the day.
31        Q       And who were you, who were you sending

4

1    that videotape to?

2        A        It was addressed to Sargent Arthur

3    Kaufman.

4        Q        And Sargent Kaufman, what was his

5    participation in this case?

6        A        He was the lead officer in the attempted

7    homicide investigation.

8        Q        Let me go back to the video, the

9    contents of the video itself, Detective Bethea.

10   Were you able to clearly -- let's go back. You state

11   that you were able to make out a black male and then

12   someone with a blue shirt?

13       A        Yes, sir.

14       Q        The person with the blue shirt, were you

15   able to make out their ethnicity or their skin

16   color?

17       A.       No.  It had no identifiable value.

18       Q        Okay.  So, I take it from that last

19   comment you were not able to make out anybody's face

20   in the video?

21       A        No, sir.

22                THE COURT:

23                What shade of blue was the shirt?

24                THE WITNESS:

25                It was a light shade of blue. It is a

26       very brief, very brief glimpse.

27                THE COURT:

28                Next question.

29   BY MR. DEBLANC:

30       Q        Detective, after placing that videotape

31   into the interoffice mail, did you ever see it

```
1              No, sir.

2              THE COURT:

3              That wasn't part of the discussions?

4              THE WITNESS:

5              No, sir.

6              THE COURT:

7              When did the police department change

8      from the traditional light blue shirts to the

9      dark blue shirts, if you remember?

10             THE WITNESS:

11             I'm sorry.  I don't know when they

12     changed.

13             THE COURT:

14             Well, it was sometime after Hurricane

15     Katrina.  They went from a traditional blue

16     shirt that the police have worn since the early

17     sixties to the navy blue shirt, correct?

18             THE WITNESS:

19             Yes, sir.

20             THE COURT:

21             Do you know when the uniform officially

22     changed from the powder blue shirt to the dark

23     blue shirt?

24             THE WITNESS:

25             I don't know.

26             THE COURT:

27             You don't know when that was?

28             THE WITNESS:

29             I believe it was before that time

30     though.

31             THE COURT:
```

Mr. Guillory related that on Monday, May 22, 2006, at an unknown time, he was going into the Opeloussas point grocery store, located at the intersection of Verret and Opelousas Street. Mr. Guillory observed a police officer chasing a black male, who appeared to be 17 or 18 years of age and heavy set. The black male being chased by the police was attired in a white tee shirt and a pair of jeans. Mr. Guillory mentioned the fact that the police was struggling with the black male, and he then heard gunshots. The Police Officer fell to the ground and the black male, fled up Opelousas Street in a western direction on foot.

At 4:52PM, Detective Barnes, being aware that a suspect was in custody, escorted Mr. Guillory to the crime scene. A show up was conducted and Mr. Guillory positively identified the suspect Eddie Harris, black male, date of birth 08-28-1982, as the individual he observed struggling with the Police Officer, followed by gunshots.

After Mr. Guillory made the positive identification, Detectives Barnes and Winston Harbin, obtained a formal taped statement from Mr. Guillory. Mr. Guillory's formal statement corroborated with his initial verbal statement.

At 5:35PM, Detectives Barnes and Gus Bethea, met with Reserve Officer Milton Ramirez, badge 10115 at the intersection of Verret and Slidell Street. The purpose of the meeting was to ascertain if a group of Spanish speaking roofers working in the area, had any information regarding the incident.

Officer Ramirez spoke with Mr. Douglas DeJesus Chavez, Hispanic male, date of birth 06-06-1984, cellular telephone number (914) 563-3851. Mr. Chavez related in Spanish, that he heard two shots, but did not witness the incident.

At 6:30PM, Detective Barnes departed the scene and went to the Fourth District Police Station, located at 1348 Richland Road.

Upon arrival at 6:35PM, Detective Barnes escorted the suspect identified as Joshua Hall, black male, date of birth 01-01-1989, from a marked police cruiser that was occupied by Officer Natasha Adams.

Detective Barnes advised Mr. Hall of his Constitutional Rights at 6:36PM, in the presence of Detective Anthony Small. Detective Barnes also present Mr. Hall with an rights of arrestee or suspect form. Mr. Hall in-turn, advised Detective Barnes that he in fact understood his rights and agreed to talk with the Detectives regarding his knowledge of the incident. Mr. Hall signed the presented rights of an arrestee or suspect form.

Exhibit 3

ORLEANS POLICE DEPARTMENT

e: 05/26/06   Time: 09:55                    I N C I D E N T   R E C A L L                              Requeste

| ident | Time | Type | Pri Dispo | Address Location | Bldg | Apt | Callers Name Callers Address | P-u |
|---|---|---|---|---|---|---|---|---|
| | | | | Beat   Team/Dist   Area | - - - | | Callers Phone | - - - |
| 05/22 | 15:39 | 222 | | SLIDELL IN FIELD OF LOC SUBJ'S CLOTHING THERE | | | C1 | |
| 05/22 | 15:39 | | | REQ UNITS BEHIND BLAINE KERN BIN | | | A1 | |
| 05/22 | 15:42 | 3400 | | NTFD OF SHIRT | | | A1 | |
| 05/22 | 15:42 | NP/3420 | OS | location is  SLIDELL ST&VERRET ST | | | | |
| 05/22 | 15:42 | NP/3671 | OS | location is  SLIDELL ST&VERRET ST | | | | |
| 05/22 | 15:42 | VIA | | COMMAND DESK COAST GUARD PETTY OFFICER LOERWALL NTFY | | | D9 | |
| 0.../22 | 15:43 | NP/B608 | EN | location is  SLIDELL ST&VERRET ST | | | | |
| 05/22 | 15:43 | | | BLAINE KERN DEN IN BACK | | | D9 | |
| 05/22 | 15:43 | CAR 12 | | HAS COMMAND OF HOSPITAL | | | D9 | |
| 05/22 | 15:43 | B608 | | ENROUTE TO SECURE THE SCENE AT 222 SLIDELL | | | A1 | |
| 05/22 | 15:43 | 26 | | TRANSPORTED TO ELMWOOD | | | D9 | |
| 05/22 | 15:44 | CCC | | NTFY TO STAND BY ON BRIDGE | | | D9 | |
| 05/22 | 15:44 | PETTY | | OFFICER LOERWALL NTFD W/COAST GUARD TO PATROL THE WATER | | | A1 | |
| 05/22 | 15:44 | CAR 3 | | REQ EMS TO STAND BY | | | D9 | |
| 05/22 | 15:44 | 1331 | | GOING TO GET PERPS TSHIRT AT 222 SLIDELL | | | D9 | |
| 05/22 | 15:44 | Incident type | | CHANGED From:18 | To:108 | | | |
| 05/22 | 15:44 | Response Type | | CHANGED From: | To:2M | | | |
| 05/22 | 15:44 | Priority | | CHANGED From:1 | To:2 | | | |
| 05/22 | 15:44 | Sub-Priority | | CHANGED From:H | To:A | | | |
| 05/22 | 15:44 | EMS 7 | | NTFY TO STAND BY AT BROOKLYN/MARR | | | D9 | |
| 05/22 | 15:45 | DR. | | MCSWAIN NTFYD | | | S6 | |
| 05/22 | 15:45 | REQ | | TO HOLD DWN ON AIR.....REQ BOAT | | | A1 | |
| 0.../22 | 15:45 | DR. | | MCSWAIN NTY (OUT OF TOWN) | | | S5 | |
| 0.../22 | 15:45 | NP/1531 | EN | location is  SLIDELL ST&VERRET ST | | | | |
| 05/22 | 15:45 | NP/1531 | OS | location is  SLIDELL ST&VERRET ST | | | | |
| 05/22 | 15:45 | NP/B608 | C | location is | | | | |
| 05/22 | 15:46 | NP/146B | EN | location is  SLIDELL ST&VERRET ST | | | | |
| 05/22 | 15:46 | Unit NP/146B | | location: ELMWOOD CHNO | | | | |
| 05/22 | 15:46 | NP/146B | RL | location is  ELMWOOD CHNO | | | | |
| 05/22 | 15:46 | NP/146B | OS | location is  ELMWOOD CHNO | | | | |
| 05/22 | 15:48 | COAST | | GUARD/LOERWALL ADVISES THEY ARE ENROUTE STANDING IN BEND IN | | | D9 | |
| 05/22 | 15:48 | RIVER... | | ADVISES THE CHOPPER IS IN THE AIR LOOKING FOR ANOTHER SUBJ IN THE | | | D9 | |
| 05/22 | 15:48 | RIVER... | | COAST GUARD #846 6181 | | | D9 | |
| 05/22 | 15:48 | NP/107B | EN | location is  SLIDELL ST&VERRET ST | | | | |
| 05/22 | 15:48 | Unit NP/107B | | location: ELMWOOD CHNO | | | | |
| 05/22 | 15:48 | NP/107B | RL | location is  ELMWOOD CHNO | | | | |
| 05/22 | 15:48 | NP/107B | OS | location is  ELMWOOD CHNO | | | | |

EXHIBIT A 1-4

```
/05/22 15:49 3500 ADIVES NEED UNIT TO 827 NUNEZ...SHOOTER POSS RAN INTO RESD...WHITE     D9
/05/22 15:49 DOUBLE...REQ UNIT FOR PERIMETER ONLY DON'T ENTER RESD                       D9
/05/22 15:49 4730 HEADING                                                                D9
/05/22 15:50 3500 REQ UNITS TO GO TO 827 NUNEZ                                           S6
/05/22 15:50 4730 ENROUTE                                                                S6
/05/22 15:50 3500 REQ ANY UNITS TO START TWD 827 NUNEZ-WHT DOUBLE HOUSE..STANDBY DO      A1
/05/22 15:50 NOT ENTER PERIMETER                                                         A1
/05/22 15:50 CHIEF SCOTT NOTF ON INCIDENT WORKING                                        S1
/05/22 15:50 NP/4730        EN          location is  SLIDELL ST&VERRET ST
/05/22 15:50 NP/3481        EN          location is  SLIDELL ST&VERRET ST
/05/22 15:50 NP/688B        EN          location is  SLIDELL ST&VERRET ST
/05/22 15:50 NP/680B        EN          location is  SLIDELL ST&VERRET ST
```

```
! ORLEANS POLICE DEPARTMENT
.e:  05/26/06   Time: 09:55                    I N C I D E N T   R E C A L L                    Requeste

:ident        Time  Type  Pri Dispo;         Address              Bldg Apt  Callers Name         P-u
                                             Location                       Callers Address
- - - - - - - - - - - - - - - - -   Beat   Team/Dist   Area   - - - -  Callers Phone     - - -
05/22 15:56 3481-VERRET/HOMER                                                              D9
05/22 15:56 Unit NP/3481       location: HOMER/VERRET
05/22 15:56       NP/3481    RL        location is  HOMER/VERRET
05/22 15:56 HAVE A PERIMETER SET UP BEHIND BLAIN KERN BY THE FLOOD WALL                    D9
05/22 15:56 4152 ADVISES TAC UNITS HAVE THE VEH                                            D9
05/22 15:57 SUBJ WAS BEHIND ALL SAINTS SCHOOL                                              D9
05/22 15:57 HAVE THE PERP'S VEH AND DRIVER                                                 D9
05/22 15:57 CCC NTYFY                                                                      D9
05/22 15:58 JOEL TALLANT NTFY (DISCHARGE)                                                  S5
05/22 15:58 3500 ADVISES ALL UNITS D4 WAS SEARCHING FOR WEAPON...CONSIDER THE SUBJ         D9
05/22 15:58 ARMED AND DANGEROUS AT THIS TIME                                               D9
05/22 15:58 REQ MEDIA TO BE BACKED UP TO NEXT BLOCK                                        D9
05/22 15:58 REQ PIO TO CORRAL MEDIA                                                        D9
05/22 15:59 MEDIA AT HOMER/NUNEZ VIA 3500                                                  D9
05/22 15:59 3609/3612 IN 800 VERRET                                                        D9
05/22 15:59 REQ PIO AT HOMER/NUNEZ FOR MEDIA                                               A1
05/22 15:59 VIA CAR 3 K9 REQ FIRE DISPLINE ON PERIMETER....DO NOT FIRE UNLESS SUBJ         D9
05/22 15:59 COMES TOWARDS THEM                                                             D9
05/22 16:00 TAC UNITS AND K9 IN FIELD                                                      D9
05/22 16:01 4100 EXPANDING PERIMETER SLIDELL/NUNEZ/TECHE/SLIDELL/HOMER...RAN ACROSS        D9
05/22 16:01 FROM HOUSE ON NUNEZ TWDS TECHE                                                 D9
05/22 16:01 PIO SGT BRICKEL ENROUTE TO HOMER/TECHE                                         A1
05/22 16:01 REQ ADDITIONAL AT HOMER/TECHE...TECHE/SLIDELL                                  A1
05/22 16:02 SUBJ POSS LIVES IN TALL TIMBERS                                                D9
05/22 16:03 SGT. WILSON NTFY VIA OFFICER TALLANT ///SGT ENROUTE WILL HANDLE IF             S6
05/22 16:03 OFFICER DISCHARGED                                                             S6
05/22 16:04 VIA CAR 3 RUNNING OPERATION...REQ SILENCE IN AREA...REQ TO CALL ARMSTRONG      D9
05/22 16:04  AIRPORT AND NEED SILENCE IN AREA FOR OPERATION...HAVE A HELICOPTER FLYIN      D9
05/22 16:04 G IN AREA                                                                      D9
05/22 16:04 4830 REQ ALL PEDS OUT THE PERIMETER                                            D9
05/22 16:05 D3 & D4 UNITS CALL FOR SERVICE TO 10-99 DISP 4                                 D9
05/22 16:06 NP/372B        EN        location is  SLIDELL ST&VERRET ST
05/22 16:06 4150 CALLING AIRPORT ABOUT HELICOPTER                                          D9
05/22 16:06 4150 NTFY ARMSTRONG AIRPORT                                                    A1
05/22 16:07 4771/4710 ON AIR                                                               D9
05/22 16:07 NP/672B        EN        location is  SLIDELL ST&VERRET ST
05/22 16:07 NP/674B        EN        location is  SLIDELL ST&VERRET ST
```

```
J ORLEANS POLICE DEPARTMENT
te:  05/26/06   Time:  09:55                    I N C I D E N T   R E C A L L                    Requeste

:ident      Time  Type  Pri Dispo         Address              Bldg Apt  Callers Name           P-u
                                           Location                       Callers Address
- - - - - - - - - - - - - - - - - - - -   Beat   Team/Dist  Area  - - - -  Callers Phone        - - -
/05/22  16:11  702B/HARBOR UNIT BEHIND BLAINE KERN BY THE LEVEE                                  D9
/05/22  16:11  NP/3753         OS          location is  SLIDELL ST&VERRET ST
/05/22  16:11  REQ HARBOR CLOSER TO SOCRATES                                                     A1
/05/22  16:11  3480 REQ HARBOR CLOSER TO SOCRATES ON OTHER SIDE OF PIPE                          D9
/05/22  16:11  NP/107B         C           location is
/05/22  16:12  NP/372B         OS          location is  SLIDELL ST&VERRET ST
/ )22  16:12  NP/4100         OS          location is  SLIDELL ST&VERRET ST
/05/22  16:20  COAST GUARD NTFY TO STAND BY AND HOLD PERIMETER                                   D9
/05/22  16:21  NP/3657         EN          location is  SLIDELL ST&VERRET ST
/05/22  16:21  NP/3657         OS          location is  SLIDELL ST&VERRET ST
/05/22  16:21  3657 IN AREA                                                                      D9
/05/22  16:21  NP/5129         OS          location is  SLIDELL ST&VERRET ST
/05/22  16:24  HOLLY W/PANTHER HELICOPTERS...STATES THEY HAVE A HELICOPTER OVER ALGIERS          D9
/05/22  16:24  AREA & IS WITH WWL                                                                D9
/05/22  16:24  TECHE/OPELOUSAS & TECHE/NEWTON                                                    D9
/05/22  16:24  OPLEASOUS/TECHE,...TECHE/NEWTON STOP CAR TRAFFIC                                  A1
/05/22  16:28  SOD GOING IN                                                                      D9
/05/22  16:28  NP/4           EN          location is  SLIDELL ST&VERRET ST
/05/22  16:28  NP/3           EN          location is  SLIDELL ST&VERRET ST
/05/22  16:28  3500 ADVISES TAC & K9 GOING IN...HAVE ALL UNITS STAY DOWN AND KEEP COVER          D9
/05/22  16:28  NP/3           OS          location is  SLIDELL ST&VERRET ST
/05/22  16:28  NP/4           OS          location is  SLIDELL ST&VERRET ST
/05/22  16:28  3500 PERMISSION                                                                   D9
/ )22  16:31  K9 WORKING TWDS THE BRIDGE                                                         D9
/05/22  16:31  NP/702B         OS          location is  SLIDELL ST&VERRET ST
/05/22  16:31  VIA COAST GUARD RESUMING PIW SEARCH                                               D2
/05/22  16:33  NP/304B         EN          location is  SLIDELL ST&VERRET ST
/05/22  16:33  NP/304B         OS          location is  SLIDELL ST&VERRET ST
/05/22  16:37  NP/5122         EN          location is  SLIDELL ST&VERRET ST
/05/22  16:37  Unit NP/5122        location: 500 OPELOUSAS
/05/22  16:37  NP/5122         OS          location is  500 OPELOUSAS
/05/22  16:39  NP/5126         EN          location is  SLIDELL ST&VERRET ST
/05/22  16:39  Unit NP/5126        location: 500 OPELOUSAS
/05/22  16:39  NP/5126         RL          location is  500 OPELOUSAS
/05/22  16:40  NP/5125         EN          location is  SLIDELL ST&VERRET ST
/05/22  16:40  Unit NP/5125        location: 500 OPELOUSAS
/05/22  16:40  NP/5125         RL          location is  500 OPELOUSAS
```

1    Q    And what happened after you got up with him?

2    A    As soon as I caught up with him, he turned

3  around in mid stride with a gun in his hand.

4    Q    Okay, and once you observed that he had a

5  gun in his hand, what did you do?

6    A    I dropped my baton and reached for the gun.

7    Q    And what happened when you went to reach for

8  the gun?

9    A    We struggled for a few seconds.

10    Q    And what happened next after you struggled

11  for a few seconds?

12    A    He shot me a couple times and then the third

13  shot, while wrestling with the gun, he shot me in the

14  neck, which instantly paralyzed me, and then he shot me

15  one more time.

16    Q    And the last instance in which he shot you,

17  where were you?

18    A    I was on the ground.

19    Q    Do you remember what that person looked like

20  that day?

21    A    Definitely.

22    Q    Could you tell the ladies and gentlemen of

23  the jury what you remember about his appearance on that

24  day?

25    A    He was a black male, wearing dark clothing.

26  He had his hair was in some kind of short twists.

27    Q    And did you have occasion to see where he

28  went after he had shot you?

29    A    No, not really.

30    Q    Okay, and what's the next thing you remember

31  after that?

32    A    I remember there was one or two people

684

1       THE COURT:

2           Mr. Donnelly, any witnesses?

3       MR. DONNELLY:

4           No, sir.

5       THE COURT:

6           All right.  Let's proceed with the

7   multiple bill hearing.

8       MR. THOMPSON:

9           At this time, the state would request that

10  the defendant be fingerprinted by Officer

11  Pollard.

12      THE COURT:

13          So ordered.  Sheriff.

14          (OTHER UNRELATED MATTERS HELD)

15      THE COURT:

16          All right.  Let's go back to the Eddie

17  Harrison case, please.  Let's proceed to the

18  multiple bill hearing.  Call your first witness.

19      MR. THOMPSON:

20          Your Honor, at this time, State would call

21  Officer Joe Pollard to the stand.

22      THE COURT:

23          Officer Pollard.

24          (P/O JOSEPH POLLARD, after having been

25  first duly sworn, did testify as follows:).

26  BY MR. THOMPSON:

27      Q   Would you please state your name for the

28  record?

29      A   Officer Joseph Pollard.

30      Q   And how are you employed?

31      A   New Orleans Police Department.  I'm assigned

32  to criminal records as a latent print examiner.

24

1       Q       Okay.

2               MR. THOMPSON:

3               At this time, Your Honor, the State would

4       offer a stipulation that Officer Pollard be

5       qualified as an expert in the taking, analysis,

6       and identification of fingerprints.

7               MR. DONNELLY:

8               So stipulated, Your Honor.

9               THE COURT:

10              Parties stipulate and I find the officer

11      to be an expert in the field of latent

12      fingerprint examination and identification.

13      Proceed.

14              MR. THOMPSON:

15              Thank you, Your Honor.

16      BY MR. THOMPSON:

17      Q       Officer Pollard, did you have the occasion

18      to take the fingerprints of Mr. Eddie Harrison today?

19      A       Yes, I did.

20      Q       Okay, and in what manner did you do that?

21      A       I'm sorry.

22      Q       In what manner did you do that?

23      A       Today I brought a fingerprint kit to court

24      with blank fingerprint cards, ink pad, and I brought

25      them to the back of the courtroom and I fingerprinted

26      him.

27      Q       Okay, and if you were shown that fingerprint

28      card do you think you would be able to recognize it?

29      A       Yes, I would.

30              MR. THOMPSON:

31              For the record, Your Honor, I'm showing

32      defense counsel what's been marked for

                                                        25

                                                    670

1       identification purposes as State's Exhibit One.

2   BY MR. THOMPSON:

3       Q     Officer Pollard, if you could identify what

4   it is that's been marked as State's Exhibit One.

5       A     It's the in court fingerprint card taken in

6   court today by myself on a Eddie Harrison.

7       Q     Okay.

8           MR. THOMPSON:

9               For the record, Your Honor, I'm showing

10          defense counsel what's been marked for

11          identification purposes as State's Exhibit Two.

12      Q     Officer Pollard, if you can take a minute to

13  look through what's been marked as State's Exhibit Two

14  and I want once you finish with that if you could

15  identify what that is to the court.

16      A     It's the Jefferson Parish certified pack

17  containing a bill of information, two sets of

18  fingerprints above the name of Eddie Harrison, above

19  the name of Arthur Victor.  There's a minute entry and

20  a plea of guilty form.

21      Q     Okay.  Now, did you have chance to compare

22  State's Exhibits One and Two in terms of fingerprints?

23      A     Yes, I did.

24      Q     Okay, and what were the results of your

25  analysis?

26      A     I compared the left thumb from the

27  fingerprint card taken in court today to the left thumb

28  above the name of Eddie Harrison and determined that

29  they are one in the same.

30          MR. THOMPSON:

31              The state would tender the witness at this

32          time, Your Honor.

26

1          THE COURT:

2          Mr. Donnelly?

3     BY MR. DONNELLY:

4          Q     Officer Pollard, I'm Don Donnelly.  Attorney

5     presenting Mr. Harrison for the purposes of the

6     hearing.  When you take these prints, is there a

7     certain standard or number of points of identification

8     that are used?

9          A     There is no standard number required but I

10    stopped at sixteen points.

11         Q     Sixteen points.  And it's your testimony

12    that the left thumb print taken this morning is

13    identical to the left thumb print on that certified

14    packet?

15         A     Yes, it is.

16         MR. DONNELLY:

17         No further questions.

18         THE COURT:

19         Redirect?

20         MR. THOMPSON:

21         No, Your Honor.

22         THE COURT:

23         Officer excused?

24         MR. THOMPSON:

25         Yes, Your Honor.

26         THE COURT:

27         Thank you.  You are excused.

28         MR. THOMPSON:

29         In conjunction with the officer's

30    testimony, Your Honor, the State would offer,

31    file, and introduce State's Exhibit One and Two.

32         MR. DONNELLY:

1    No objection.

2    THE COURT:

3    One and two are admitted into and made a

4    part of the record.  On March the 17, 2008, the

5    district attorney's office filed a multiple bill

6    of information charging Eddie Harrison with

7    being a double offender.  Specifically, the

8    state alleged that Eddie Harrison was previously

9    charged in case number 9806230 on the docket of

10    division C of the 24th Judicial District Court

11    with two counts of violating Louisiana Revised

12    Statute 14:64 relative to armed robbery and that

13    afterward, on May 10, 1999, he pled guilty as

14    charged.  The state has submitted the testimony

15    of Officer Pollard along with State's Exhibit

16    One, Two, and Three, in an effort to prove the

17    allegations in the multiple bill and the court

18    will now review the exhibits.

19    I have before me an ink fingerprint card

20    taken by Officer Pollard from defendant Harrison

21    in Court today, as well as certified true copies

22    of documents from the 24th Judicial District

23    Court for the Parish of Jefferson, including a

24    bill of information, a set of inked latent human

25    fingerprints, minute entries indicating that the

26    defendant did, in fact, plead guilty as charged

27    to counts one and two of the bill and what is

28    commonly known as a Boykinization form.  It's

29    entitled Defendant's Acknowledgement of

30    Constitutional Rights and Waiver of Rights on

31    entry of a Plea of Guilty in case number 986230

32    Division C, of the 24th JDC.

28

673

1  ...cer Pollard has comp... d th... ...nked

2  fingerprints on S1 to the inked fingerprints

3  provided by the clerk of the 24th JDC and found

4  that the Eddie Harrison who pled guilty as

5  charged on the 10th of May, 1999, in Jefferson

6  Parish is one and the same individual who sits

7  before the court today whose fingerprints were

8  taken today and who was found guilty as charged

9  by a jury of attempted first degree murder in

10  case number 465-700 G.

11     Based on the testimony and the evidence, I

12  find Eddie Harrison to be one and the same

13  individual convicted by the jury in 465700 G,

14  and convicted by plea of guilty in Division C of

15  the 24th Judicial District Court in case number

16  9806230.  I find the defendant guilty as charged

17  of the multiple bill and I find him to be a

18  double offender.

19     Let the record further reflect that I have

20  reviewed the Boykin form used by the judge of

21  the 24th Judicial District Court.  It is a three

22  page form.  It is signed by attorney Armond,

23  signed the judge, Eddie Harrison. It's a three

24  paged form and it passes constitutional mustard

25  for a Boykinization in connection with a guilty

26  plea to a felony.  Let the exhibits be entered

27  into and made a part of the record.

28     Any other witnesses?

29  MR. THOMPSON:

30  Not at this time, Your Honor.

31  THE COURT:

32  Mr. Donnelly, you have any witnesses?

29

1   MR. DONNELLY:

2   No, sir.

3   THE COURT:

4   Does your client have anything to say

5 before I impose sentence?

6   MR. DONNELLY:

7   No, sir.

8   THE COURT:

9   Mr. Harrison, would you step up to the end

10 of that table with your lawyer?

11   MR. DONNELLY:

12   Your Honor, I do have two motions to make

13 pre-sentencing.

14   THE COURT:

15   All right.

16   MR. DONNELLY:

17   Motion for a new trial which has been

18 filed in the court record and copy tendered to

19 the district attorney.

20   THE COURT:

21   The court now has before it a motion for a

22 new trial that alleges that the verdict is

23 contrary to law and the evidence.  The court

24 finds that the evidence in this case was

25 overwhelming and that the state's proof complied

26 with the allegations found in the bill of

27 information.  Therefore, the motion for a new

28 trial is denied and I note your objection.

29   MR. DONNELLY:

30   Your Honor, additionally I have a motion

31 for post verdict judgment of acquittal.

32   THE COURT:

30

24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFERSON
STATE OF LOUISIANA

DIVISION *C*

NUMBER: *98-6230*

STATE OF LOUISIANA

VERSUS

*Eddie Harrison III*

FILED: _____          DEPUTY CLERK

### DEFENDANTS ACKNOWLEDGEMENT OF CONSTITUTIONAL
### RIGHTS AND WAIVER OF RIGHTS ON ENTRY OF A
### PLEA OF GUILTY

**TO THE DEFENDANT, BY THE TRIAL JUDGE, PERSON TO PERSON:**

Your attorney has indicated to me that he/she advised you of your rights (1) to a trial by jury or by the Court alone, (2) to confront your accusers, and (3) of your right against self incrimination, and that by entering your plea of guilty, you are waiving or giving up these rights. He/she has also indicated to me that you have advised him/her that you understand these things. Is that correct? *yes*

I want you to convince me also that you understand what you are doing by entering this plea of guilty. Consequently, I am going to explain the nature of the crime to which you are pleading guilty, and I will also explain the consequences of a plea of guilty. If you have any questions, or if you do not understand any thing I say, stop me, and I will answer your questions or give you any additional instructions which you may desire.

First, tell this Court how old you are? And how much schooling have you had? *8/30/82   Age 16*

You are pleading guilty to the crime of *2 counts Armed Robbery   LSA-R.S-14:64*

which occurred on the *2nd 9th* day of *October*, 19 *98*. The maximum sentence which I can impose is *99* years. *Each count* (There is no probation, parole, or suspension of sentence for the crime of Armed Robbery or Attempted Armed Robbery. Do you understand that? *yes*

Do you understand that the plea of guilty is your decision, and no one can force you to so plead? To plead guilty is your voluntary act and must be free of any vice or defect which would render your ability to plead guilty inadequate. Has anyone used any force, intimidation, coercion or promise or reward to either you or any member of your family for the purpose of making or forcing you to plead guilty? *no*

IMAGED

MAY 21 1999

Page 2

Have you been advised by your counsel that in the event I accept this plea of guilty, that you will be sentenced as follows: (All general and special conditions of probation which you have agreed to abide by are attached.)

_5 years DOC at Hard Labor on each count the sentences to be concurrent w/each other and to be served without benefit of probation parole or suspension of sentence w/ credit for all time served._

You have the right to a trial by jury, which jury may find you guilty as charged, guilty of a lesser crime, or not guilty. You have the right to hire an attorney of your choice to defend you at that trial. If you cannot afford an attorney, one will be appointed for you, which will not cost you anything. By entering a plea of guilty; you are waiving or giving up these rights. Do you understand that? _yes_

At any jury trial you have the right to confront your accusers and compel testimony on your behalf from your witnesses. By entering this plea of guilty, you are waiving or giving up these rights. Do you understand that? _yes_

If you were to go on trial, and in the event of a conviction, if the jury finds you guilty, you would have the right to appeal. Again, in the event of an appeal, if you could not afford an attorney, one would be appointed, which would not cost you anything. By entering a plea of guilty you are waiving or giving up these rights. Do you understand that? _yes_

If you plead guilty, and this court accepts your plea, you would not have the right to assert any allegations of defects, such as: (a) an illegal arrest, (b) an illegal search and seizure, (c) an illegal confession, (d) an illegal lineup, and (e) the fact that the state might not be able to prove said charge or that a jury would find you not guilty. Do you understand that by pleading guilty you are waiving or giving up these rights? _yes_

You have a right to waive trial by jury and be tried by the Court alone. Do you understand that by pleading guilty you are waiving or giving up these rights? _yes_

Do you understand that by pleading guilty, you are telling this court that you have, in fact, committed the crime to which you are pleading guilty? _yes_

Page 3

**DEFENDANT'S ATTORNEY:**

I, as attorney for the defendant, was present during the recitation of the foregoing colloquy between the defendant and the trial judge at the time of the defendant's plea of guilty.

I, also, have informed the defendant of his or her rights, particularly the nature of the crime to which he or she is pleading guilty, the maximum sentence the court could impose under the law, and the fact that the defendant, by entering this plea of guilty, is waiving his or her right to a trial by jury; or by the court alone, his or her right to confront his/her accusers, his or her right against self-incrimination, and lastly, that his or her only right against self-incrimination, and lastly, that his or her only right of appeal is for review of jurisdictional defects; and I am entirely satisfied that the defendant knowingly, willingly, and intelligently and voluntarily has entered this plea of guilty, knowing the consequences.

_____
**ATTORNEY**

I, as the defendant in this case, acknowledge that the foregoing has been read to me, that my attorney and the trial judge have explained the nature of the crime to which I am pleading guilty, all of my rights to me, and what rights I am waiving or giving up, as listed above, and that I have been given every opportunity by the trial judge to ask questions in open court about anything I do not understand and about all of the consequences regarding my plea of guilty. I am completely satisfied with the explanations of my attorney and the judge.

I FURTHER ACKNOWLEDGE THAT MY ACT OF PLEADING GUILTY IS A KNOWING, INTELLIGENT, FREE, AND VOLUNTARY ACT ON MY PART. I know that no one can force me to plead guilty. I know that by pleading guilty I admit I committed the said crime. I know this plea of guilty is more than a confession. It is also a conviction. Nothing remains except for the judge to give judgment and give me my punishment. I waive all delays for sentencing and acknowledge I am ready for sentencing.

_____
**DEFENDANT**

**BY THE TRIAL JUDGE:**

I, as trial judge, have entered into the foregoing colloquy with the defendant. I am entirely satisfied that the defendant was aware of the nature of the crime to which he or she has pleaded guilty, that the defendant did, in fact, commit said crime, understands the consequences of said plea of guilty, and has made a knowing, intelligent, free, and voluntary act of pleading guilty to the above mentioned crime and that there is a factual basis for the acceptance of this plea. I, therefore, accept the defendant's plea of guilty.

I would like to inform the defendant that he/she has five (5) days from today's date to appeal this conviction, and three (3) years from today's date to seek post-conviction relief.

DATE 5/10/99 _____          _____
**JUDGE**

REVISED: 3/8/93

A TRUE COPY OF THE ORIGINAL
ON FILE IN THIS OFFICE.

_____
DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON

06-30-22;10:38AM;Algiers Region;    ibrary                    ;504-596-266(         # 1/ 6

1        TWENTY-FOURTH JUDICIAL DISTRICT COURT

2            PARISH OF JEFFERSON

3            STATE OF LOUISIANA

4

5

6  STATE OF LOUISIANA           No. 98-6230

7  VERSUS

8  EDDIE HARRISON           Division C

9

10             * * * * * *

11      PROCEEDINGS in the above numbered and entitled cause before

12  the Hon. Alan G. Green, taken on May 10, 1999.

13             * * * * * *

14

15  APPEARANCES

16

17  ROBERT ODINET,   Assistant District Attorney,
18             Parish of Jefferson

19

20  A.F. ARMOND,  Attorney for Defendant.

21

22

23

24

25

26

27

28  COURT REPORTER:

29        Lee J. Barras, Jr.   OCR & CCR

30

31

32

I

*** BOYKIN TRANSCRIPTS ***
May 10, 1999



| | |
|---|---|
| 1 | **PROCEEDINGS** |
| 2 | * * * * * * |
| 3 | REPORTER'S NOTE: |
| 4 | The following is a transcript of the plea of Eddie |
| 5 | Harrison, as ordered by the court.  Is should be noted that two other co- |
| 6 | defendants, Arthur Victor and Frederick McCurty,  were also Boykinized |
| 7 | in these same proceedings.  The defendants were Boykinized in the |
| 8 | following order: Mr. Victor, Mr. Harrison and then Mr. McCurty. |
| 9 | * * * * * * |
| 10 | MR. ARMOND: |
| 11 | Your Honor, Sonny Armond on behalf of Mr. Harrison. |
| 12 | Your Honor, please let the record reflect that a waiver of constitutional |
| 13 | rights and a plea of guilty form is being presented to the court.  Please let |
| 14 | the record also reflect that I have counseled Mr. Harrison as to the rights |
| 15 | he is waiving and giving up and he wishes to do so at this time.  Your |
| 16 | Honor, he has advised that he was never arraigned on these charges. |
| 17 | THE COURT: |
| 18 | Check the record. |
| 19 | THE MINUTE CLERK: |
| 20 | He was never arraigned. |
| 21 | THE COURT: |
| 22 | Let's arraign him at this time. |
| 23 | MR. ARMOND: |
| 24 | I would waive a formal reading of the Bill of Information, |
| 25 | tender a preliminary plea of not guilty.  However, after talks with the state |
| 26 | and the court, we are withdrawing that plea of not guilty and tender a plea |
| 27 | of guilty as charged. |
| 28 | THE COURT: |
| 29 | Swear in Mr. Harrison. |
| 30 | * * * * * * |
| 31 | Eddie Harrison, after first having been duly sworn in the |
| 32 | cause, testified on his oath as follows: |

2

06-30-22;10:38AM;Algiers Region   lbrary                    ;504-595-266                # 3/  6



1

2  EXAMINATION BY THE COURT:

3  Q      Mr. Harrison, your attorney has indicated to me that he has advised you of

4  your right to a trial by jury or by the court alone.  Your right to confront your

5  accusers and your right against self- incrimination and that by entering a pleas of

6  guilty you are waiving or giving up these rights.  He has also indicated to me that

7  you have advised him that you understand these things.  Is that correct?

8  A      Yes, sir.

9  Q      At this time you wish to withdraw your pleas of not guilty and enter pleas

10 of guilty to two counts of armed robbery?

11 A      Yes, sir.

12 Q      I want you to convince me also that you understand what you're doing by

13 entering these pleas of guilty so, therefore, I'm going to explain the nature of the

14 crimes to which you are pleading guilty and I will also explain the consequences

15 of your pleas.  If you have any questions or you do not understand anything I say,

16 I want you to stop me and I will answer your questions for you and give you any

17 additional information you may need.

18        First of all, tell the court how old you are and how much schooling you

19 have had.

20 A      16 and I completed the 9th grade.

21 Q      Do you understand that you're pleading guilty to two counts of armed

22 robbery which occured on the 8th and 9th of October of 1990, and the maximum

23 sentence that I can impose on you is 99 years at hard labor and that there is no

24 parole, probation or suspension of sentence for the crime of armed robbery?  Do

25 you understand all of that?

26 A      Yes, sir.

27 Q      Do you understand that the plea of guilty is your decision anf that no one

28 con force you to plead?  It is a voluntary act and it must be free from any vices or

29 defects which would render your ability to plead guilty inadequate.  Has anyone

30 used any force, intimidation, coercion or promises or rewards to either you or

31 any members of your family in order to make you plead guilty?

32 A      No, sir.

3

06-30-22;10:38AM;Algiers Regional     brary                    :504-596-2686        # 4/ 6



1   Q      Have you been advised by your attorney that in the event your plea of

2   guilty is accepted you'll be sentenced to 5 years with the Department of

3   Corrections on each count and those sentences are to run concurrent with each

4   other and you are to be given credit for time served?  Do you understand that?

5   A      Yes, sir.

6   Q      You have a right to a trial by jury.  A jury could either find you guilty as

7   charged, guilty of a lesser crime or not guilty.  You also have a right to hire an

8   attorney of your choice to defend you at that trial and if you could not afford an

9   attorney, one would appointed for you, which would not cost you anything.  By

10  entering a plea of guilty you are waiving or giving up these right.  Do you

11  understand that?

12  A      Yes, sir.

13  Q      At any jury trial you have the right to confront your accusers and to

14  compel testimony on your behalf from your witnesses. By entering this plea of

15  guilty you are waiving or giving up these rights.  Do you understand that?

16  A      Yes, sir.

17  Q      If you were to go on trial and in the event of a conviction, that is, if the

18  jury finds you guilty, you would have the right to an appeal.  Again, in the event

19  of an appeal if you could not afford an attorney, one would be appointed for you,

20  which would not cost you anything.  By entering a plea of guilty you are waiving

21  or giving up these rights.  Do you understand that?

22  A      Yes, sir.

23  Q      If you plead guilty and this court accepts your plea you do not have the

24  right to assert any allegations of defects, such as an illegal arrest ;  an illegal

25  search and seizure; an illegal confession; an illegal line-up; and the fact that the

26  state might not be able to prove the charges or that a jury would find you not

27  guilty.  Do you understand that by pleading guilty you are waiving or giving up

28  these rights?

29  A      Yes, sir.

30  Q      You have the right to waive the trial by jury and be tried by the court

31  alone.  Do you understand that by pleading guilty you are waiving or giving up

32  these rights?

4



1    A     Yes, sir.

2    Q     Do you also understand that by pleading guilty you are telling this court

3    that you have in fact committed the crimes to which you are pleading guilty?

4    A     Yes, sir.

5    Q     Are you aware and have you been advised by your attorney that you have

6    5 days from today's date to appeal this conviction or this sentencing, and 3 years

7    from today's date to seek post-conviction relief?

8    A     Yes, sir.

9         THE COURT:

10            I'm satisfied that the defendant is making a knowing and intelligent

11    waiver of his rights and that his pleas of guilty are knowing, intelligent

12    and voluntary.  The court will accept the pleas.

13        MR. ARMOND:

14            We would withdraw any outstanding motions and waive delays,

15    Your Honor

16        THE COURT:

17            Mr. Harrison, at this time I going to sentence you to 5 years with

18    the Department of Corrections on each count.  Each count is to run

19    concurrent with each other.  And that is to be served without benefit of

20    probation, parole or suspension of sentence, and you are to be given credit

21    for time served.

22

23            (The proceedings of May 10, 1999, were then concluded:)

24                              * * * * * *

25

26

27

28

29

30

31

32

5

06-30-22:10:38AM:Algiers Region   lbrary                    :504-596-266        # 6/ 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

CERTIFICATE

◊ ◊ ◊ ◊ ◊ ◊

I, Lee J. Barras, Jr., Official Court Reporter and Certified Court
Reporter, in and for the State of Louisiana, do hereby certify that the
foregoing transcript in the matter of "STATE OF LOUISIANA VERSUS
EDDIE HARRISON," #98-6230, Div, C, 24th Judicial District Court,
taken on May 10, 1999, to be true and correct to the best of my ability and
understanding.

Lee J. Barras, Jr.
OCR & CCR

6

# 24th Judicial District Court
## Parish of Jefferson - State of Louisiana

State of Louisiana
  Versus
FREDERICK MCCURDY, ARTHUR VICTOR,
EDDIE HARRISON
Judge: Alan J. Green
ADA: Robert L. Odinet

Case Number: 9806230
Division: C
Complaint: J0768098
Date: 05/10/1999
Court Reporter: Lee Barras

The Defendant, EDDIE HARRISON, appeared before the bar of the Court this day.

The Defendant is in Jefferson Parish Prison.

The following charges have been resolved on May 10, 1999
    The Defendant withdrew a plea of NOT GUILTY and tendered a plea of GUILTY on count 1)
    14:64  F  II  ARMED ROBBERY .
    The Defendant withdrew a plea of NOT GUILTY and tendered a plea of GUILTY on count 2)
    14:64  F  II  ARMED ROBBERY .

The Defendant was represented by A F. ARMOND.

The Defendant is sentenced to
    5 years on count 1 concurrently.
    5 years on count 2 concurrently.

Plea was acceptable to the State.

The Court advised the Defendant of his/her rights:  The right to a trial by judge/jury.  The right to confront his/her accusers.  The right against self-incrimination.  The Defendant waived these rights and a waiver of rights form was executed and filed into the record.

Note of evidence taken.

Sentence to be served without benefit of parole, probation, or suspension of sentence.

The Court sentenced the Defendant to imprisonment at hard labor for a term of 5 years.  Giving the Defendant credit for all time served.  The Defendant is committed to the Louisiana Department of Corrections for execution of said sentence in conformity with L.S.A.-R.S. 15:824.

MAY 21 1999

The Defendant reported his/her birthdate as August 20, 1982 and age as  16 years.

_Shelisa D. Gilbert, Deputy Clerk_

Now, therefore, you, the said Sheriff, are hereby commanded to carry out in full every part of the aforesaid sentence.  And for so doing this shall be your sufficient warrant and authority.

Witness, the Honorable Alan J. Green, Judge presiding in the 24th Judicial District Court, Division C, Parish of Jefferson, at the hall of sitting of the same, in the City of Gretna,  this 10 day of May in the year 1999.

RECEIVED
MAY 14
Judicial Administrator's Off...

_Alan J. Green, Judge_

A TRUE COPY OF THE ORIGINAL
ON FILE IN THIS OFFICE.

DEPUTY CLERK
24TH Hard Labor Commitment
PARISH OF JEF...

Entry:

8/23/2021                                   OPCSO Criminal District Court Docket Master

```
                                    D O C K E T   M A S T E R           Date: 06/23/2021
    Case: 465788                                                        Time:  07:01:39
  Section: G
   Class: 2
```
                        ORLEANS PARISH CRIMINAL DISTRICT COURT

=====================================================================================
DFM DEFENDANT(S):              CNTS CHARGE(S):
=====================================================================================

  1 HARRISON, EDDIE  3rd
                               1  RS 14  (27)30        BOND:            0.00
                                  ATT 1ST DEGREE MURDER
                               1  RS 14  95.1          BOND:       50,000.00
                                  POSS OF A FIREARM OR WEAPON BY FELON
                               1  RS 15  529.1         BOND:            0.00
                                  MULTIPLE BILL

  2 HALL, JOSHUA J
                               1  RS 14  (25)(27)30    BOND:       25,000.00
                                  ACC ATT 1ST DEGREE MURDER

=====================================================================================
  DATE     PROCEEDINGS
=====================================================================================

  06/20/2006                                                        CHEATHAM D
            FILED BILL OF INFORMATION
            CAPIS ISSUED
            BOND SET $50,000.00(HARRISON),$25,000.00(HALL)
            MAGISTRATE PAPERWORK(NONE)
  06/21/2006                                                        CHEATHAM D
            ALLOTTED.
            FILED SURETY BOND,$25,000.00(HALL),DATE OF BOND:05-26-2006
                                    SURETY:AMERICAN BANKERS INS.CO
  07/18/2006                                                        BUTSCHERM
            >AS TO DEFENDANT, EDDIE HARRISON III: >ARRAIGNMENT SET FOR
            08/25/06 >PDO1L
            >AS TO DEFENDANT, JOSHUA J HALL: >ARRAIGNMENT SET FOR 08/25/06
            >NOTIFY DEFENDANT. >NOTIFY SURETY.
  07/24/2006                                                        BUTSCHERM
            >DEFENSE COUNSEL MARTIN REGAN APPEARED WITHOUT DEFENDANT, JOSHUA
            J HALL FOR STATUS HEARING >DEFENSE FILED: -MOTION AND ORDER FOR
            PRODUCTION OF THE POLICE/SHERIFF INCIDENT REPORT OF THE
            INVESTIGATION; -MOTION FOR DISCLOSURE OF IMPEACHING
            INFORMATION; >-SUPPRESS EVIDENCE. >-SUPPRESS STATEMENT.
            >-SUPPRESS IDENTIFICATION. >-PRELIMINARY HEARING. >-DISCOVERY
            AND INSPECTION. >-MOTION TO ENROLL AS COUNSEL OF RECORD. COURT
            NOTES ARRAIGNMENT IN THIS MATTER IS SET 8/25/06. UPON
            ARRAIGNMENT, COURT WILL ASSIGN DATES IN THIS MATTER.
            >ARRAIGNMENT SET FOR 08/25/06 >NOTIFY DEFENDANT. NOTIFY SURETY.
            NOTIFY ATTORNEY, MARTIN REGAN.
  08/25/2006                                                        SIMS S
            >DEFENDANT IN CUSTODY AND NOT BROUGHT INTO COURT. >COURT RESET
            ARRAIGNMENT. >ARRAIGNMENT SET FOR 09/05/06 >PDO1L
            >DEFENDANT, JOSHUA J HALL , APPEARED. >COURT RESET ARRAIGNMENT.
            >ARRAIGNMENT SET FOR 09/05/06 >NOTIFY DEF.COUNSEL. >DNOC.
  09/05/2006                                                        BUTSCHERM
            >THE DEFENDANT, EDDIE HARRISON III APPEARED FOR ARRAIGNMENT.
            FOR ARRAIGNMENT.    ATTORNEY, KERRY CUCCIA, STANDING IN FOR
            ARRAIGNMENT ONLY. >THE COURT >READING OF BILL OF INFORMATION
            WAIVED. >DEFENDANT ENTERED PLEA OF NOT GUILTY. >DEFENDANT
            INFORMED OF RIGHT TO TRIAL BY JUDGE OR JURY. >HEARING ON
            MOTIONS SET FOR 10/05/06 >PDO1L
            >THE DEFENDANT, JOSHUA J HALL APPEARED FOR ARRAIGNMENT.
            ARRAIGNMENT WITH ATTORNEY, ARIS COX. >READING OF BILL OF
            INFORMATION WAIVED. >DEFENDANT ENTERED PLEA OF NOT GUILTY.
            >DEFENDANT INFORMED OF RIGHT TO TRIAL BY JUDGE OR JURY. STATE
            FILED: -STATE'S LIST OF DISCOVERY TO DEFENSE COUNSEL. >HEARING
            ON MOTIONS SET FOR 10/05/06 >NOTIFY DEFENDANT.
  09/06/2006                                                        BUTSCHERM
            >AS TO DEFENDANT, EDDIE HARRISON III: STATE PROVIDED DEFENSE
            WITH POLICE REPORT. >STATE FILED: -WRIT OF HABEAS CORPUS;
            GRANTED. -LIST OF ALL DISCOVERY TURNED OVER TO DEFENSE COUNSEL.
  09/07/2006                                                        BUTSCHERM
            >AS TO DEFENDANT, EDDIE HARRISON III: DEFENSE COUNSEL, DON
            DONNELLY, FILED: >-MOTION AND INCORPORATED MEMORANDUM FOR
            DISCOVERY & INSPECTION.
  10/05/2006                                                        BUTSCHERM
            >DEFENSE COUNSEL DON DONNELLY APPEARED WITHOUT DEFENDANT, EDDIE
            HARRISON III FOR HEARING ON MOTIONS >DEFENDANT IN CUSTODY AND
            NOT BROUGHT INTO COURT. >CONTINUED ON STATE MOTION STATE FILED:
            -MOTION FOR CONTINUANCE GRANTED. -WRIT OF HABEAS CORPUS;
            GRANTED. >HEARING ON MOTIONS SET FOR 11/22/06 >PDO1L
            >DEFENDANT, JOSHUA J HALL APPEARED WITH COUNSEL, ARIS COX FOR
            HEARING ON MOTIONS AOA, RHONDA DOUGLAS, PRESENT ON BEHALF OF

```

8/23/2021                                    CPCSO Criminal District Court Docket Master

THE STATE. >CONTINUED ON STATE MOTION STATE FILED: >MOTION FOR
CONTINUANCE; GRANTED. >HEARING ON MOTIONS SET FOR 11/27/86
>DNOC.

11/27/2886                                                          BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: DUE TO A BOMB THREAT IN
THIS MATTER, COURT RECESSED EARLY THIS DATE. >HEARING ON
MOTIONS SET FOR 03/08/07 >NOTIFY DEF.COUNSEL. >POOJL
>AS TO DEFENDANT, JOSHUA J HALL: DUE TO A BOMB THREAT ON THE
COURTHOUSE, COURT RECESSED EARLY. DEFENDANT APPEARED 12/28/86
AND WAS SERVED TO APPEAR 1/8/87. >HEARING ON MOTIONS SET FOR
01/08/07 >NOTIFY DEFENDANT. >SEND NOTICE TO DEFENSE COUNSEL,
ARIS COX. >NOTIFY SURETY.

12/06/2886                                                          BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: STATE FILED: >-MOTION AND
ORDER FOR WRIT OF HABEAS CORPUS AD PROSEQUENDUM FOR THE EASTERN
DISTRICT OF LOUISIANA. GRANTED. COURT ORDERED DEFENDANT
TRANSPORTED ON 1/8/07.

12/15/2886                                                          BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: STATE FILED: >-AMENDMENT
TO WITNESS LIST BY THE STATE.
>AS TO THE DEFENDANT, JOSHUA J HALL: STATE FILED: >-AMENDMENT
TO WITNESS LIST BY THE STATE.

01/08/2887                                                          BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: DEFENSE COUNSEL, DON
DONNELLY, PRESENT. >DEFENDANT IN CUSTODY AND NOT BROUGHT INTO
COURT. >CONTINUED ON STATE MOTION >HEARING ON MOTIONS SET FOR
01/24/07 >PLACE THE DEFENDANT ON THE JAIL LIST. (DEFENDANT IS A
FEDERAL INMATE.)
>DEFENDANT, JOSHUA J HALL APPEARED WITH COUNSEL, ARIS COX FOR
HEARING ON MOTIONS >CONTINUED ON STATE MOTION >HEARING ON
MOTIONS SET FOR 01/24/07 >NOTIFY DEF.COUNSEL. >DNOC.
>AS TO DEFENDANT, EDDIE HARRISON III: STATE FILED: >-MOTION AND
ORDER FOR WRIT OF HABEAS CORPUS AD PROSEQUENDUM FOR THE EASTERN
DISTRICT OF LOUISIANA TO HAVE DEFENDANT HARRISON TRANSPORTED ON
1/24/07 TO SECTION G FOR HEARING ON MOTIONS IN THIS MATTER @
9:00 A.M.  GRANTED.

01/18/2887                                                          BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: >STATE FILED: >-AMENDED
WITNESS LIST BY THE STATE (2 PAGES). >COURT ORDERED THE CLERK
OF COURT TO IMMEDIATELY ISSUE SUBPOENAS FOR MOTIONS IN THIS
MATTER.
>AS TO DEFENDANT, JOSHUA J HALL: >STATE FILED: >-AMENDED
WITNESS LIST BY THE STATE (2 PAGES). >COURT ORDERED THE CLERK
OF COURT TO IMMEDIATELY ISSUE SUBPOENAS FOR MOTIONS IN THIS
MATTER.

01/24/2887                                                          BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: COURT CLOSED THIS DATE.
ADA, RHONDA DOUGLAS, PRESENT ON BEHALF OF THE STATE. >HEARING
ON MOTIONS SET FOR 03/08/07 >POOJL
>THE DEFENDANT, JOSHUA J HALL APPEARED FOR HEARING ON MOTIONS
WITH COUNSEL, ARIS COX ADA, RHONDA DOUGLAS, PRESENT ON BEHALF
OF THE STATE. COURT CLOSED THIS DATE. >HEARING ON MOTIONS SET
FOR 03/08/07 >NOTIFY DEF.COUNSEL. >NOTIFY SURETY. >DNOC.

02/13/2887                                                          BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: ADA, RHONDA DOUGLAS,
PRESENT. >STATE FILED: >-MOTION AND ORDER FOR WRIT OF HABEAS
CORPUS AD PROSEQUENDUM. >TO HAVE DEFENDANT TRANSPORTED ON
3/8/07.  GRANTED.

03/08/2887                                                          BUTSCHERM
>THE DEFENDANT, EDDIE HARRISON III APPEARED FOR HEARING ON
MOTIONS WITH COUNSEL, DON DONNELLY ADA, RHONDA DOUGLAS, PRESENT
ON BEHALF OF THE STATE. ATTORNEY, DOUGLAS, MOVED FOR AND COURT
ORDERED A SEQUESTRATION OF WITNESSES. >THESE MOTIONS DID LIE:
>SUPPRESS IDENTIFICATION >PRELIMINARY HEARING >STATE CALLED
SGT. ARCHIE KAUFMANN, WHO IDENTIFIED BOTH DEFENDANTS. OFC.
ANDRE GONZALES, JR., WHO IDENTIFIED DEFENDANT HARRISON. OFC.
REBECCA GRUBEART, WHO IDENTIFIED BOTH DEFENDANTS. DET. DECINDA
BARNES, WHO IDENTIFIED DEFENDANT HARRISON RUTH FARMER, WHO
IDENTIFIED DEFENDANT HARRISON ERIN FARMER, WHO IDENTIFIED
DEFENDANT HARRISON. >STATE EVIDENCE: >S-1 S-2 S-3 CERTIFIED
COPY OF CONVICTION >STATE AND DEFENSE SUBMITTED THE MATTER.
>THE COURT DENIED THE MOTION TO SUPPRESS IDENTIFICATION MOTION
TO SUPPRESS IDENTIFICATION AS IT RELATES TO WITNESS GUILLORY IS
MOOT. >COURT FOUND PROBABLE CAUSE. >DEFENSE OBJECTED. >TRIAL
SET FOR 06/19/07 >POOJL
>THE DEFENDANT, JOSHUA J HALL APPEARED FOR HEARING ON MOTIONS
WITH COUNSEL, ARIS COX ADA, RHONDA DOUGLAS, PRESENT ON BEHALF
OF THE STATE. ATTORNEY DOUGLAS MOVED FOR AND COURT ORDERED A
SEQUESTRATION OF WITNESSES. >THESE MOTIONS DID LIE: >SUPPRESS
STATEMENT >PRELIMINARY HEARING >STATE CALLED SGT. ARCHIE
KAUFMANN, WHO IDENTIFIED BOTH DEFENDANTS. OFC. ANDRE GONZALES,
JR., WHO IDENTIFIED DEFENDANT HARRISON. OFC. REBECCA GRUBEART,
WHO IDENTIFIED BOTH DEFENDANTS. DET. DECINDA BARNES, WHO
IDENTIFIED DEFENDANT HARRISON. RUTH FARMER, WHO IDENTIFIED

08/23/2021

DEFENDANT HARRISON. ERIN FARMER, WHO IDENTIFIED DEFENDANT
HARRISON. >STATE EVIDENCE: >S-1 S-2 S-3 CERT. COPY OF
CONVICTION (HARRISON) >STATE AND DEFENSE SUBMITTED THE MATTER.
>DENIED MOTION TO SUPPRESS STATEMENT. >COURT FOUND PROBABLE
CAUSE. >DEFENSE OBJECTED. >TRIAL SET FOR 06/19/07 >NOTIFY
DEF.COUNSEL. >NOTIFY SURETY. >DNOC.

05/29/2007                                                    BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: ADA, RHONDA DOUGLAS,
PRESENT AND FILED: -MOTION AND ORDER FOR WRIT OF HABEAS CORPUS
AD PROSEQUENDUM FOR >THE EASTERN DISTRICT OF LOUISIANA.
GRANTED. -WRIT. GRANTED. COURT ORDERED DEFENDANT HARRISON
TRANSPORTED 6/19/07 TO SECTION G

06/05/2007                                                    BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: DEFENSE COUNSEL, DON
DONNELLY, PRESENT AND MOVED THE COURT TO ISSUED SUBPOENAS TO
THE FOLLOWING WITNESSES FOR TRIAL ON 6/19/07; GRANTED: SGT.
TYRONE ROBINSON, NOPD - 4TH DISTRICT. SGT. LUTHER RANDALL, NOPD
- 5TH DISTRICT. COURT ORDERED THIS MATTER SET 6/19/07 FOR TRIAL
TO REMAIN IN EFFECT. COURT ORDERED THE CLERK OF COURT TO ISSUE
SUBPOENAS TO SGTS. ROBINSON AND RANDALL AT THE ADDRESSES LISTED
ABOVE. >TRIAL SET FOR 06/19/07 >PDOOL
>AS TO DEFENDANT, EDDIE HARRISON III: LATER, DEFENSE COUNSEL,
DON DONNELLY, MOVED THE COURT TO ISSUE A SUBPOENA FOR
CO-DEFENDANT, JOSHUA HALL, TO APPEAR 6/19/07 AS A WITNESS IN
THIS MATTER.  GRANTED. COURT ORDERED THE CLERK OF COURT TO
ISSUE A SUBPOENA TO CO-DEFENDANT, JOSHUA HALL, 3427 BLAIR
STREET, NEW ORLEANS, LOUISIANA 70131 TO APPEAR 6/19/07 AS A
WITNESS IN THIS MATTER. >TRIAL SET FOR 06/19/07 >PLACE THE
DEFENDANT ON THE JAIL LIST.

06/18/2007                                                    BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: ATTORNEY, DON DONNELLY,
PRESENT FOR STATUS HEARING. ADA, LASHONDA WEBB, PRESENT ON
BEHALF OF THE STATE. DEFENSE COUNSEL, DON DONNELLY, FILED
MOTION FOR CONTINUANCE. STATE JOINED IN DEFENDANT'S MOTION FOR
CONTINUANCE) >CONTINUED ON JOINT MOTION. CONTINUANCE OF THE
6/19/07 TRIAL IN THIS MATTER. COURT ORDERED THIS MATTER SET
6/19/07 FOR TRIAL BE VACATED AND SET ASIDE. >STATUS HEARING SET
FOR 06/25/07 >PDOOL
>AS TO DEFENDANT, JOSHUA J HALL: >ON JOINT MOTION BY THE STATE
AND DEFENSE COUNSEL, DON DONNELLY, THE COURT GRANTED A
CONTINUANCE) >STATUS HEARING SET FOR 06/25/07 >SEND NOTICE TO
DEFENDANT, JOSHUA HALL. >SEND NOTICE TO DEFENSE COUNSEL, ARIS
COX. >NOTIFY SURETY.

06/19/2007                                                    BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: THIS MATTER IS MOOT ON
TODAY'S DOCKET. >RE-SET TO 6/25/07.
>DEFENDANT, JOSHUA J HALL APPEARED WITHOUT COUNSEL FOR STATUS
HEARING >STATUS HEARING SET FOR 06/25/07 >SEND NOTICE TO
DEFENSE COUNSEL, ARIS COX. >NOTIFY SURETY. LATER, ATTORNEY,
MARTIN REGAN, APPEARED AND NOTIFIED OF 6/25/07. >DNOC.
>AS TO DEFENDANT, EDDIE HARRISON III: THIS MATTER IS MOOT ON
TODAY'S DOCKET.
>AS TO DEFENDANT, JOSHUA J HALL: THIS MATTER IS MOOT ON TODAY'S
DOCKET.

06/25/2007                                                    BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: ADA, RHONDA DOUGLAS,
PRESENT ON BEHALF OF THE STATE. ATTORNEY, DON DONNELLY, PRESENT
ON BEHALF OF DEFENDANT HARRISON. >TRIAL SET FOR 09/18/07 >PDOOL
>DEFENDANT, JOSHUA J HALL APPEARED WITHOUT COUNSEL FOR STATUS
STATUS HEARING. ADA, RHONDA DOUGLAS, PRESENT ON BEHALF OF
STATE. >TRIAL SET FOR 09/18/07 >SEND NOTICE TO DEFENSE COUNSEL,
ARIS COX. >NOTIFY SURETY. >DNOC.

09/12/2007                                                    BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: >STATE FILED: >-WITNESS
WORKSHEET

09/18/2007                                                    BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: ATTORNEY, DON DONNELLY,
DRD, PRESENT ON BEHALF OF DEFENDANT. >THE DEFENDANT IS IN THE
CUSTODY ON THE FEDERAL TIER AND WAS NOT BROUGHT INTO OPEN
COURT. STATE MOVED FOR A CONTINUANCE. GRANTED OVER DEFENSE'S
OBJECTION. COURT NOTES DEFENSE'S OBJECTION. >EVIDENTIARY
HEARING SET FOR 09/28/07 >SEND NOTICE TO DEFENSE COUNSEL, DON
DONNELLY, OPD. STATE TO FILE NECESSARY PAPERWORK TO HAVE
DEFENDANT TRANSPORTED IN FROM THE FEDERAL TIER. >PDOOL
>DEFENDANT, JOSHUA J HALL APPEARED WITH COUNSEL, ARIS COX FOR
TRIAL DEFENSE COUNSEL, COX, ANNOUNCED READINESS FOR TRIAL.
>EVIDENTIARY HEARING SET FOR 09/28/07 >SEND NOTICE TO DEFENSE
COUNSEL ON STATE MOTION >EVIDENTIARY HEARING SET FOR
09/28/07 >SEND NOTICE TO DEFENSE COUNSEL, ARIS COX. >DNOC.

09/28/2007                                                    BUTSCHERM

>THE DEFENDANT, EDDIE HARRISON III APPEARED FOR HEARING ON FOR
EVIDENTIARY HEARING WITH COUNSEL, DON DONNELLY. >COURT ORDERED
A SEQUESTRATION OF WITNESSES. >STATE CALLED DET. GUS BATHAIA
SGT. ARCHIE KAUFMANN >TRIAL SET FOR 03/18/08 >SEND NOTICE TO
DEFENSE COUNSEL, DON DONNELLY, OPD. >PDOOL

02/23/2021        OPCSO Criminal District Court Docket Master

>THE DEFENDANT, JOSHUA J HALL APPEARED FOR HEARING ON MOTIONS
EVIDENTIARY HEARING WITH COUNSEL, ARIS COX/MARTIN REGAN. >COURT
ORDERED A SEQUESTRATION OF WITNESSES. >STATE CALLED DET. GUS
BATHAIA SGT. ARCHIE KAUFMANN >TRIAL SET FOR 03/10/08 >SEND
NOTICE TO DEFENSE COUNSEL, MARTIN REGAN. >DEFENDANT NOTIFIED IN
OPEN COURT.

02/14/2008                                BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: ATTORNEY, DON DONNELLY,
OPD, PRESENT AND FILED: -MOTION TO QUASH BILL OF INFORMATION.
ATTORNEY, DONNELLY, MOVED THAT THIS MATTER BE SET FOR HEARING
03/03/08.  GRANTED. >HEARING ON MOTIONS SET FOR 03/03/08 >SEND
NOTICE TO DEFENSE COUNSEL, DON DONNELLY, OPD. NOTIFY STATE.
>PDDII

02/27/2008                                BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: ADA, GREG THOMPSON,
PRESENT AND FILED: -STATE'S MOTION AND ORDER FOR WRIT OF HABEAS
CORPUS AD PROSEQUENDUM; GRANTED. -WRIT. COURT ORDERED DEFENDANT
TRANSPORTED ON 3/10/08 AND REMANDED >TO OPP UNTIL COMPLETION OF
TRIAL IN THIS MATTER.

03/03/2008                                BUTSCHERM
>DEFENSE COUNSEL DON DONNELLY APPEARED WITHOUT DEFENDANT, EDDIE
EDDIE HARRISON III, FOR HEARING ON MOTIONS. >PRESENCE OF
DEFENDANT WAIVED. ADA, GREG THOMPSON, PRESENT ON BEHALF OF THE
STATE AND FILED: STATE'S RESPONSE TO THE DEFENDANT'S MOTION TO
QUASH. ARGUMENT HEARD BY DEFENSE AND STATE. AFTER ARGUMENT,
COURT DENIED DEFENDANT'S MOTION TO QUASH. COURT NOTES DEFENSE'S
OBJECTION AND ITS INTENT TO SEEK REVIEW.
>AS TO DEFENDANT, EDDIE HARRISON III: ADA, GREG THOMPSON,
PRESENT AND FILED: >-STATE'S RESPONSE TO THE DEFENDANT'S MOTION
TO QUASH.

03/05/2008                                BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: ADA, GREG THOMPSON,
PRESENT AND FILED: -JUDICIAL CERTIFICATE OF NECESSITY TO SECURE
THE ATTENDANCE OF WITNESSES FROM W/OUT THE STATE OF LOUISIANA;
AND, -STATE'S NOTICE OF INFORMATION.

03/10/2008                                BUTSCHERM
>THE DEFENDANT, JOSHUA J HALL APPEARED FOR STATUS HEARING WITH
COUNSEL, THOMAS CALAGERO ADA, GREG THOMPSON, PRESENT AND
ADVISED THAT THE STATE INTENDS TO PROCEED W/ CO-DEFENDANT,
EDDIE HARRISON, FIRST AND FILED NO OBJECTION. COURT ORDERED DEFENDANTS
COUNSEL, CALAGERO, MADE NO OBJECTION. COURT ORDERED DEFENDANTS
SEVERED IN THIS MATTER. >TRIAL SET FOR 05/07/08 >SEND NOTICE TO
DEFENSE COUNSEL, MARTIN REGAN LAW FIRM & THOMAS CALAGERO.
>NOTIFY SURETY. >ONOC.
>DEFENDANT, EDDIE HARRISON III , APPEARED REPRESENTED BY DON
FOR TRIAL REPRESENTED BY DON DONNELLY. >DEFENDANT, JOSHUA J
HALL , APPEARED REPRESENTED BY DON DONNELLY TRIAL REPRESENTED
BY ATTORNEY, THOMAS CALAGERO. ADAS, GREG THOMPSON AND RHONDA
DOUGLAS, PRESENT ON BEHALF OF THE STATE. STATE MOVED TO
PROCEED W/ DEFENDANT EDDIE HARRISON'S TRAIL AS TO COUNT 1:
14(27)30 - ATTEMPTED 1ST DEGREE MURDER. DEFENDANT SERVED ON
STATE'S MOTIONS.  DEFENSE COUNSEL MADE NO OBJECTION. >DEFENDANT
ELECTED TRIAL BY JURY. >GREG THOMPSON and RHONDA DOUGLAS
REPRESENTED THE STATE. >WERE DULY IMPANELED, ACCEPTED BY THE
STATE AND DEFENSE. >TRIAL CONTINUED TO 03/11/08 >NOTIFY
DEF.COUNSEL. >PDDII

03/11/2008                                BUTSCHERM
>DEFENDANT, EDDIE HARRISON III , APPEARED REPRESENTED BY DON
DONNELLY >GREG THOMPSON and RHONDA DOUGLAS REPRESENTED THE
STATE. >TRIAL CONTINUED FROM 03/10/08 AFTER THE JURY WAS
SWORN, >DON DONNELLY WAIVED THE OPENING STATEMENT RESERVING
HIS RIGHT TO ONE PRIOR TO ANY DEFENSE CASE. >STATE WITNESSES:
S-004 DPTY. :MADELYN COLLINS STATE OFFERED STIPULATION THAT MS.
COLLINS IS AN EXPERT IN THE FIELD OF SEROLOGY; DEFENSE TENDERED
ON THE PREDICATE. COUT FOUND MS. COLLINS TO BE AN EXPERT IN THE
FIELD OF SEROLOGY. STATE OFFERED STIPULATION THAT MR. MARTINEZ
IN AN EXPERT IN THE FIELD OF GUN SHOT RESIDUE; DEFENSE
STIPULATES; COURT FINDS MR. MARTINEZ TO BE AN EXPERT IN THE
FIELD OF GUN SHOT RESIDUE. >STATE EVIDENCE: S-0801 S-0802
S-0803 S-0804 S-0805 S-0806 S-0807 S-0808 S-0809 S-0810 S-0811
S-0812 S-0813 S-0814 S-0815 S-0816 S-0817 S-0818 S-0819 S-0820
S-0821 S-0822 S-0823 S-0824 S-0825 S-0826 S-0827 S-0828 S-0829
S-0830 S-0831 S-0832 S-0833 S-0834 S-0835 S-0836 S-0837 S-0838
S-0839 S-0840 S-0841 S-0842 S-0843 S-0844 S-0845 S-0846 S-0847
S-0848 S-0849 S-0850 S-0851 S-0852 S-0853 S-0854 S-0855 S-0856
S-0857 S-0858 S-0859 S-0860 S-0861 S-0862 S-0863 S-0864 S-0865
S-0866 S-0867 S-0868 S-0869 S-0870 S-0871 S-0872 S-0873 S-0874
S-0875 S-0876 S-0877 SPENT CASING; COPPER CASING PRESENTED TO
JURY & FILED S-0878 COPPER FRAGMENT PRESENTED TO JURY & FILED

| | | |
|---|---|---|
| S-0879 | CELLPHONE HOLDER/CLIP | PRESENTED TO JURY & FILED |
| S-0880 | EVIDENCE TAG | PRESENTED TO JURY & FILED |
| S-0881 | BATON | PRESENTED TO JURY & FILED |
| S-0882 | EVIDENCE TAG | PRESENTED TO JURY & FILED |
| S-0883 | CELLULAR TELEPHONE | PRESENTED TO JURY & FILED |

6/23/2021

OPCSO Criminal District Court Docket Master

```
S-0084   FIREARM                    PRESENTED TO JURY & FILED
S-0085   AMMUNITION & MAGAZINE CLIP  PRESENTED TO JURY & FILED
S-0086   NOPD POLICE RADIO           PRESENTED TO JURY & FILED
S-0087   T-SHIRTS (2)                PRESENTED TO JURY & FILED
S-0088   EVIDENCE TAG                PRESENTED TO JURY & FILED
S-0089   GUN POWDER RESIDUE KIT      PRESENTED TO JURY & FILED
S-0090   TENNIS SHOES                PRESENTED TO JURY & FILED
S-0091   LIVE AMMUNITION (DEMONSTRATIVE PURPOSES ONLY) S-0092
S-0093 S-0094 S-0095 S-0096 S-0097 S-0098 S-0099 S-0100 KATRINA
PINE & NAME PLATE S-0101 S-0102 S-0103 S-0104 HANDCUFF POUCH
W/CUFFS, CIGARETTE BOX, LIGHTER, FLASHLIGHT, RADIO HOLDER, 3
BELT KEEPS,,2 PENS S-0105 S-0106 S-0107 2 CONDOMS, DRIVER'S
LICENSE & LIGHTER S-0108 AND SEARCH WARRANT. S-0109 >TRIAL
CONTINUED TO 03/12/08 >SEND NOTICE TO DEFENSE COUNSEL, DON
DONNELLY, OPD. >PDOJL
```

03/12/2008                                                     BUTSCHERM
>THE DEFENDANT, EDDIE HARRISON III APPEARED FOR TRIAL WITH
COUNSEL, DON DONNELLY >DAY THREE OF TRIAL. >STATE CALLED SWORN
GAVE TESTIMONY AND WERE CROSS EXAMINED BY THE S-0016 DET.
EDWARD PALMAPERO S-0017 DET. HAROLD WHICHARD S-0018 SGT.
TYRONE ROBINSON S-0019 SGT. LUTHER RANDALL S-0020 MEREDITH
ACOSTA, STATE STIPULATED THAT MS. ACOSTA IS AN EXPERT IN THE
FIELD OF FIREARM EXAMINATION AND IDENTIFICATION; DEFENSE JOINED
IN STIPULATION; COURT FOUND MS. ACOSTA TO BE AN EXPERT IN THE
FIELD OF FIREARM EXAMINATION AND IDENTIFICATION. S-0021
JENNIFER SCHROEDER, STATE OFFERED STIPULATION THAT MS.
SCHROEDER IS AN EXPERT IN THE FIELD OF MICROBIOLOGY AND
FORENSIC DNA; DEFENSE JOINS IN STIPULATION; COURT FINDS MS.
SCHROEDER TO BE AN EXPERT IN THE FIELD OF MICROBIOLOGY AND
FORENSIC DNA. S-0022 ANDRES GONZALES, WHO IDENTIFIED DEFENDANT
IN OPEN COURT S-0023 DR. ALAN MARR, STATE OFFERED STIPULATION
THAT DR. MARR IS A SURGEON AND AN EXPERT IN THE FIELD OF
SURGERY AND SURGICAL CRITICAL CARE; DEFENSE JOINS IN
STIPULATION; COURT FINDS DR. MARR TO BE A SURGEON AND AN EXPERT
IN THE FIELD OF SURGICAL CRITICAL CARE. THE STATE MARKED AND
INTRODUCED THE FOLLOWING EXHIBITS INTO EVIDENCE. S-0110 BLUE
JEANS & BELT            PRESENTED TO JURY AND FILED > S-0111
SHIRT                   PRESENTED TO JURY AND FILED S-0112
REGIONS BANK SLIP       PRESENTED TO JURY AND FILED >
S-0113   EVIDENCE BAG W/TAG      PRESENTED TO JURY AND FILED
S-0114   DNA REPORT              PRESENTED TO JURY AND FILED
S-0115   PHOTOGRAPH              PRESENTED TO JURY AND FILED
S-0116   PHOTOGRAPH              PRESENTED TO JURY AND FILED
S-0117   PHOTOGRAPH              PRESENTED TO JURY AND FILED
S-0118   PHOTOGRAPH              PRESENTED TO JURY AND FILED
S-0119   MODEL HEAD    (DEMONSTRATIVE PURPOSES ONLY) S-0120
MEDICAL RECORD              RECORD ONLY JURY VIEWED THE RECORD.
THE STATE THEN RESTED @ 3:13 P.M. THE DEFENSE THEN RESTED @ 3:13
P.M. TRIAL IN THIS MATTER IS SET 3/13/08. PLEASE PLACE
DEFENDANT ON THE JAIL LIST. >TRIAL SET FOR 03/13/08 >PDOJL

03/13/2008                                                     BUTSCHERM
>DEFENDANT, EDDIE HARRISON III , APPEARED REPRESENTED BY DON
DONNELLY >DAY 4 OF TRIAL. >GREG THOMPSON and RHONDA DOUGLAS
REPRESENTED THE STATE. >TRIAL CONTINUED FROM 03/12/08 >JURY
RETIRED TO DELIBERATE. >JURY RETURNED. >JURY RETIRED TO
DELIBERATE. >JURY RETURNED. >JURY RETIRED TO DELIBERATE. >JURY
RETURNED WITH VERDICT. >FOR DEFENDANT EDDIE HARRISON III >FOR 1
AS 14 (27) 30 DEFENDANT FOUND GUILTY OF JURY. >MULTIPLE BILL
HEARING SET FOR 03/19/08 STATE ADVISED OF ITS INTENT TO FILE
MULTIPLE BILL. >SEND NOTICE TO DEFENSE COUNSEL, DON DONNELLY,
OPD. >PDOJL

03/17/2008                                                     BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: >STATE FILED: >-MOTION AND
ORDER FOR WRIT OF HABEAS CORPUS AD PROSEQUENDUM TO >HAVE
DEFENDANT TRANSPORTED ON 3/19/08; GRANTED. >MULTIPLE BILL,
CHARGING DEFENDANT AS A DOUBLE OFFENDER. -WRIT OF TRANSPORT;
GRANTED.

03/19/2008                                                     BUTSCHERM
>THE DEFENDANT, EDDIE HARRISON III APPEARED FOR MULTIPLE BILL
HEARING WITH COUNSEL, DON DONNELLY ADA, GREG THOMPSON, PRESENT
ON BEHALF OF THE STATE. THE STATE CALLED THE FOLLWING WITNESSES
FOR VICTIM IMPACT; 1-REBECCA GRESSLY 2-ANDRES GONZALES, SR.
3-LUCIA GONZALES, JR. 4-OFC. ANDRES GONZALES, JR. 5-SGT. SCOTT
MONACO >STATE AND DEFENSE STIPULATED THAT OFC. JOE POLLARD IS
EXPERT IN FINGERPRINTS. >STATE CALLED >OFC. JOE POLLARD STATE
OFFERED THE FOLLOWING AS EVIDENCE THIS DATE; S-1 FINGERPRINT
CARD S-2 CERTIFICATE PACKET S-3 FINGERPRINT CARD >THE COURT
FOUND THE DEFENDANT GUILTY AS A DOUBLE OFFENDER. >SENTENCED AS
MULTIPLE OFFENDER TO 100 YEARS, HARD LABOR AT DEPT. OF
CORRECTIONS.)CREDIT FOR TIME SERVED. >THIS SENTENCE CONCURRENT
WITH W/ ANY OTHER SENTENCE IMPOSED, IMPOSED, W/OUT THE BENEFIT
OF PROBATION, PAROLE OR SUSPENSION OF SENTENCE. COURT NOTES
THAT THIS IS A CRIME OF VIOLENCE. DEFENSE COUNSEL, DONNELLY,
FILED: -MOTION FOR NEW TRIAL; DENIED. -MOTION FOR POST-VERDICT

OPCSO Criminal District Court Docket Master

6/23/2021

JUDGEMENT OF ACQUITAL; DENIED. >MOTION FOR APPEAL AND
DESIGNATION OF RECORD, GRANTED. COURT APPOINTED THE LA.
APPELLATE PROJECT TO REPRESENT DEFENDANT ON APPEAL APPEAL MUST
BE LODGED ON OR BEFORE 5/23/08. -MOTION TO RECONSIDER SENTENCE;
DENIED. COURT NOTES DEFENSE OBJECTIONS. STATE FILED: -MOTION
TO RELEASE EVIDENCE TO THE VICTIM; GRANTED. TRIAL AS TO COUNT 2
IS SET ON 05/07/08. PLEASE PLACE DEFENDANT ON THE JAIL LIST.
>CASE CLOSED, THIS DEFENDANT.
>THE DEFENDANT, EDDIE HARRISON III APPEARED FOR STATUS HEARING
WITH COUNSEL, DON DONNELLY >TRIAL SET FOR 05/07/08 >NOTIFY
DEF.COUNSEL. >PDO3L

05/05/2008                                              BUTSCHERM

>AS TO DEFENDANT EDDIE HARRISON III: ADA, GREG THOMPSON,
PRESENT ON BEHALF OF THE STATE. >FOR COUNT 2 RS 14.95.1 FELON
WITH FIREARM NOLLE PROSEQUI. >CASE CLOSED AS TO DEFENDANT
HARRISON ONLY.
>AS TO DEFENDANT JOSHUA J HALL: ADA, GREG THOMPSON, PRESENT ON
BEHALF OF THE STATE AND FILED: -MOTION TO CONTINUE 5/7/08
TRIAL. >CONTINUED ON STATE MOTION. >ATTORNEY(S) TO APPEAR
5/7/08 TO SELECT NEW TRIAL DATE.

05/07/2008                                              BUTSCHERM

>DEFENDANT, JOSHUA J HALL APPEARED WITH COUNSEL, THOMAS CALAGERO
FOR STATUS HEARING ADA, GREG THOMPSON, PRESENT ON BEHAL OF THE
STATE AND ADVISED THAT ON PREVIOUS >JOINT MOTION BY THE STATE
AND DEFENSE; THE COURT GRANTED A >TRIAL SET FOR 07/22/08 >SEND
NOTICE TO DEFENSE COUNSEL, THOMAS CALAGERO. >NOTIFY SURETY.
>DNOC.
>AS TO DEFENDANT EDDIE HARRISON: THIS CASE IS CLOSED FOR THIS
DEFENDANT.

06/30/2008                                              BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: STATE FILED: >-MOTION TO
TRANSFER THE EVIDENCE INTO THE CUSTODY OF THE BUREAU OF
ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES.

07/18/2008                                              WRIGHTD

>TRIAL SET FOR 07/21/08 >TRIAL SET FOR 07/22/08 >SEND NOTICES.
GREG THOMPSON APPEARED ON BEHALF OF THE STATE. >NOTIFY
DEF.COUNSEL. >PDO3L
>TRIAL SET FOR 07/21/08 TRIAL SET FOR 07/22/08 >SEND NOTICES.
>NOTIFY DEF.COUNSEL. >PDO3L

07/21/2008                                              WRIGHTD

>THE DEFENDANT, EDDIE HARRISON III APPEARED FOR TRIAL WITH
COUNSEL, DON DONNELLY THIS MATTER IS MOOT ON TODAYS DOCKET.
>TRIAL CONTINUED TO 07/22/08 >SEND NOTICES. >NOTIFY
DEF.COUNSEL. >PDO3L
>THE DEFENDANT, JOSHUA J HALL APPEARED FOR TRIAL WITH COUNSEL,
THOMAS CALAGERO >TRIAL CONTINUED TO 07/22/08 >SEND NOTICES.
>NOTIFY DEF.COUNSEL. >PDO3L

07/22/2008                                              BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: TRIAL IS MOOT THIS DATE.
>CASE CLOSED, THIS DEFENDANT.
>DEFENDANT, JOSHUA J HALL APPEARED WITH COUNSEL, THOMAS CALAGERO
FOR TRIAL STATE MOVED FOR A ONE-DAY CONTINUANCE IN THIS MATTER;
GRANTED. >TRIAL CONTINUED TO 07/23/08 >SEND NOTICE TO DEFENSE
COUNSEL, THOMAS CALAGERO. >NOTIFY SURETY. >DNOC.

07/23/2008                                              BUTSCHERM

>DEFENDANT, JOSHUA J HALL , APPEARED REPRESENTED BY THOMAS
CALAGERO AND MA DEFENDANT REPRESENTED BY ATTORNEYS, THOMAS
CALAGERO AND MARTIN REGAN. STATE AMENDED THE BILL TO REFLECT A
CHANGE IN THE INCIDENT DATE. DEFENDANT, THROUGH COUNSEL, WAIVED
A READING OF THE BILL AND ENTERED A PLEA OF NOT GUILTY. STATE
FILED: -768 NOTICE -767 NOTICE >DEFENDANT ELECTED TRIAL BY
JURY. JUROR # 26 OF THE JURY POOL WAS EXCLUDED FROM TODAY'S
PROCEEDINGS AS HE WAS PREVIOUSLY SELECTED AS A JUROR IN ANOTHER
SECTION OF COURT PRIOR TO TODAY'S PROCEEDINGS. >GREG THOMPSON
and RHONDA DOUGLAS REPRESENTED THE STATE. >STATE WITNESSES:
>STATE EVIDENCE: S-001 S-002 S-003 S-004 S-005 S-006 S-007
S-008 S-009 S-010 S-011 S-012 S-013 S-014 S-015 S-016 S-017
S-018 S-019 S-020 S-021 S-022 S-023 S-024 S-025 S-026 S-027
S-028 >DEFENSE WITNESSES: >IN REBUTTAL THE STATE CALLED >JURY
RETIRED TO DELIBERATE. >JURY RETURNED. >JURY RETIRED TO
DELIBERATE. >JURY RETURNED WITH VERDICT. >FOR DEFENDANT JOSHUA
J HALL >FOR 3 RS 14 (25) (27) 30 ACC ATT FIRST DEGREE MURDER
>DEFENDANT FOUND NOT GUILTY BY JURY. >CASE CLOSED, THIS
DEFENDANT. COURT ORDERED ALL EVIDENCE ENTERED INTO EVIDENCE
(SEE ABOVE) BE TAKEN INTO THE CUSTODY OF THE CLERK OF COURT'S
EVIDENCE ROOM.

06/29/2009                                              BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: FILING OF WRITS >FOURTH
CIRCUIT WRIT # 2008-KA-1118 FILED TODAY. CONVICTION AND
SENTENCE AFFIRMED.

03/31/2010                                              BUTSCHERM

>AS TO DEFENDANT, EDDIE HARRISON III: FILING OF WRITS >SUPREME
COURT WRIT # 2009-KO-1745 FILED TODAY. WRIT WAS DENIED.

06/23/2011                                              WRIGHTD

6/23/2021                              OPCSO Criminal District Court Docket Master

>DEFENSE COUNSEL SHAWN DIGGINS APPEARED WITHOUT DEFENDANT,
EDDIE HARRISON III FOR FILING(S) IN OPEN COURT >DEFENSE FILED:
>-WRIT OF HABEAS CORPUS AD TESTIFICANDUM. >-MOTION FOR
EVIDENTIARY HEARING. >-APPLICATION FOR POST CONVICTION RELIEF.
                                                        BUTSCHERM
03/21/2013
>DEFENSE COUNSEL CATE BARTHOLOMEW APPEARED WITHOUT DEFENDANT,
EDDIE HARRISON III FOR FILING(S) IN OPEN COURT DEFENSE FILED:
-MOTION TO ENROLL AS COUNSEL OF RECORD. >EVIDENTIARY HEARING
SET FOR 06/13/13 >NOTIFY DEF.COUNSEL. >PDOJL
                                                        BUTSCHERM
05/02/2013
>DEFENSE COUNSEL CATE BARTHOLOMEW APPEARED WITHOUT DEFENDANT,
EDDIE HARRISON III FOR FILING(S) IN OPEN COURT >THE DEFENSE
FILED: >-MOTION AND ORDER FOR WRIT OF HABEAS CORPUS AD
PROSEQUENDUM. >GRANTED.
                                                         WRIGHTD
06/13/2013
>DEFENSE COUNSEL CATE BARTHOLOMEW DID NOT APPEAR ON BEHALF OF
EDDIE HARRISON III FOR EVIDENTIARY HEARING >CONTINUED ON
DEFENSE MOTION. >EVIDENTIARY HEARING SET FOR 07/25/13 IN
SECTION G . >NOTIFY DEFENDANT. >NOTIFY DEF.COUNSEL.
                                                        BUTSCHERM
07/24/2013
>DEFENSE COUNSEL CATE BARTHOLOMEW APPEARED WITHOUT DEFENDANT,
EDDIE HARRISON III FOR FILING(S) IN OPEN COURT >DEFENSE FILED:
>-MOTION TO CONTINUE 7/25/2013 EVIDENTIARY HEARING; GRANTED.
THIS MATTER SET 7/25/13 IS VACATED AND SET ASIDE. -DEFENSE
WITNESS LIST; CLERK OF COURT, PLEASE ISSUE SUBPOENAS TO ALL
LISTED ON DEFENSE WITNESS LIST TO APPEAR 9/5/2013 AND ANY OTHER
DATE THIS MATTER IS CONTINUED TO.  THANK YOU.°°°° >EVIDENTIARY
HEARING SET FOR 09/05/13 >NOTIFY DEF.COUNSEL. >PDOJL
                                                        BUTSCHERM
07/25/2013
>AS TO DEFENDANT, EDDIE HARRISON III: EVIDENTIARY HEARING -
MOOT - KEEP 9/5/2013 SETTING. >PDOJL.
                                                        BUTSCHERM
09/05/2013
>DEFENSE COUNSEL CATE BARTHOLOMEW APPEARED WITHOUT DEFENDANT,
EDDIE HARRISON III FOR EVIDENTIARY HEARING DEFENDANT DID NOT
APPEAR AS HE IS IN DOC CUSTODY AND NOT TRANSPORTED, DEFENSE TO
RE-FILE WRIT. >EVIDENTIARY HEARING SET FOR 11/06/13 >NOTIFY
DEF.COUNSEL. CLERK OF COURT, PLEASE SERVE ALL WITNESSES LISTED
AT ALL ADDRESSES ON DEFENSE WITNES LIST. THANK YOU. >PDOJL.
                                                        BUTSCHERM
10/30/2013
>DEFENSE COUNSEL CATE BARTHOLOMEW ON BEHALF OF DEFENDANT, EDDIE
HARRISON III REQUESTED THIS MATTER BE SET FOR EVIDENTIARY
HEARING; GRANTED. >EVIDENTIARY HEARING SET FOR 01/14/14 >NOTIFY
DEF COUNSEL. >PDOJL
                                                        BUTSCHERM
11/06/2013
>AS TO DEFENDANT, EDDIE HARRISON III: EVIDENTIARY HEARING -
MOOT AS PREVIOUSLY RE-SET TO 1/14/14. >PDOJL.
                                                        BUTSCHERM
01/14/2014
>DEFENSE COUNSEL CATE BARTHOLOMEW APPEARED WITHOUT DEFENDANT,
EDDIE HARRISON III FOR EVIDENTIARY HEARING >CONTINUED ON STATE
MOTION DEFENSE FILED: -MOTION AND ORDER FOR WRIT OF HABEAS
CORPUS AD PROSEQUENDUM; GRANTED. CLERK OF COURT, PLEASE PROCESS
THE ABOVE WRIT. >EVIDENTIARY HEARING SET FOR 03/21/14 >NOTIFY
DEF COUNSEL. >PDOJL
                                                        BUTSCHERM
03/14/2014
>DEFENSE COUNSEL CATE BARTHOLOMEW APPEARED WITHOUT DEFENDANT,
EDDIE HARRISON III FOR FILING(S) IN OPEN COURT DEFENSE FILED:
>-DEFENSE WITNESS LIST °°°°CLERK OF COURT, PLASE ISSUE
SUBPOENA TO ALL LISTED ON DEFENDANT'S WITNESS LIST FILED THIS
DATE TO APPEAR FOR EACH AND EVERY POST-CONVICTION AND
EVIDENTIARY HEARING SET IN THIS MATTER. NOTE: NEXT DATE SET IN
THIS MATTER IS 3/21/14; PLEASE ISSUE DEFENSE SUBPOENAS. THANK
YOU.
                                                        BUTSCHERM
03/21/2014
>THE DEFENDANT, EDDIE HARRISON III APPEARED FOR EVIDENTIARY
HEARING WITH COUNSEL, CATE BARTHOLOMEW ADA, KYLE DALY, PRESENT
ON BEHALF OF THE STATE. STATE MOVED THAT IT BE ALLOWED TO
RESPOND IN WRITING; GRANTED. DEFENSE FILED: -MOTION AND ORDER
FOR WRIT OF HABEAS CORPUS; GRANTED. -DEFENSE WITNESS LIST
(CLERK PLEASE SERVE ALL LISTED ON DEFENSE WITNESS LIST TO
APPEAR 5/16/14). STATE FILED: -RECEIPT OF DISCOVERY
>EVIDENTIARY HEARING SET FOR 05/16/14 >NOTIFY DEF.COUNSEL.
>PDOJL.
                                                        BUTSCHERM
03/25/2014
>AS TO DEFENDANT, EDDIE HARRISON III: FILING(S) IN OPEN COURT:
STATE FILED: -STATE'S MOTION TO DISQUALIFY COUNSEL PURSUANT TO
RULE 1.11 OF THE LOUISIANA RULES OF PROFESSIONAL CONDUCT.
                                                        BUTSCHERM
05/15/2014
>AS TO DEFENDANT, EDDIE HARRISON III: FILING(S) IN OPEN COURT
DEFENSE COUNSEL, CATE BARTHOLOMEW, FILED: -DEFENDANT'S RESPONSE
TO STATE'S MOTION TO DISQUALIFY COUNSEL; AND, >-MOTION TO
CONTINUE W/OUT DATE PENDING RULING OF THE COURT. STATE FILED:
-STATE'S MOTION TO STAY POST-CONVICTION RELIEF PROCEEDINGS
PENDING RULING ON MOTION TO DISQUALIFY COUNSEL AND ALTERNATIVE
MOTION TO SET RULE TO SHOW CAUSE.

OPSO Criminal District Court Docket Master

6/23/2021

>AS TO DEFENDANT, EDDIE HARRISON III: FILING IN OPEN COURT:
ADA, ANDREW PICKETT, PRESENT ON BEHALF OF THE STATE AND FILED:
>-STATE'S MOTION TO STAY POST-CONVICTION RELIEF PROCEEDINGS
PENDING RULING ON MOTION TO DISQUALIFY COUNSEL AND ALTERNATIVE
MOTION TO SET RULE TO SHOW CAUSE; GRANTED. POST-CONVICTION
RELIEF IS STAYED PENDING THE COURT'S RULING ON STATE'S MOTION
TO DISQUALIFY COUNSEL. STATE'S MOTION TO DISQUALIFY COUNSEL IS
STILL PENDING AND COURT TO MAKE IT RULING AT A LATER DATE.
THEREFORE, DEFENDANT'S MOTION TO CONTINUE WITHOUT DATE PENDING
RULING OF THE COURT IS GRANTED.

05/16/2014                                                    BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III EVIDENTIARY HEARING - MOOT
ON TODAY'S DOCKET. >AWAITING RULING ON STATE'S MOTION TO
DISQUALIFY COUNSEL.

05/04/2015                                                    BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III FILING(S) IN OPEN COURT
ATTORNEY, CATE BARTHOLOMEW, FILED: -MOTION TO WITHDRAW AS
COUNSEL OF RECORD.

05/15/2015                                                    BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III RULING COURT GRANTED
ATTORNEY CATE BARTHOLOMEW'S MOTION TO WITHDRAW AS COUNSEL OF
RECORD. STATE MADE NO OBJECTION.

09/13/2016                                                    BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III FILING(S) IN OPEN COURT
ATTORNEY, NUMMI S. IBRAHIM, FILED: -MOTION TO ENROLL AS COUNSEL
OF RECORD.

04/28/2021                                                    BUTSCHERM
>AS TO DEFENDANT, EDDIE HARRISON III: FILING(S) FILED W/CLERK'S
OFFICE ON 4/28/21 AND REC'D IN SECTION G THIS DATE: DEFENDANT
FILED: -SECOND OR SUBSEQUENT UNIFORM APPLICATION FOR POST-
CONVICTION RELIEF; -MEMORANDUM IN SUPPORT OF PEITTION FOR
POST-CONVICTION RELIEF; AND, -PETITIONER'S MOTION FOR STAY OF
POST-CONVICTION RELIEF PROCEEDINGS.

==================================================================
                         END OF DOCKET MASTER
==================================================================

Disclaimer:
The Orleans Parish Sheriff's Office provides computer services to both the Orleans Parish Clerk of Criminal District Court and the Orleans
Parish Criminal District Court. The Orleans Parish Sheriff's Office DOES NOT maintain or ensure the information provided is complete
and accurate, and this information can change quickly. Therefore, the information on this site may not reflect the true charges, status, next
court date, or other information regarding a case. The information is provided as a request under the Freedom of Information Act, and the
Public Records Act. Nothing contained herein is intended to imply or infer the guilt or wrongdoing of any person(s) listed on this site. This
information shall not be considered, or used as, a public document, or official document, and no other publication or copying of this
information is allowed without the express written consent of the person(s), and the Orleans Parish Criminal District Court.

For questions, comments, and other information you may contact the Orleans Parish Clerk of Criminal District Court, Records Division at
(504) 658-9000. This information is made available to the public and law enforcement in the interest of public safety. Any unauthorized
use of this information is forbidden and subject to criminal prosecution.